PATHFINDER MINES
CORPORATION, Plaintiff,

v.

William CLARK,* Secretary of the U.S. Department of Interior, and the United States of America, Defendants,

and

Arizona Wildlife Federation and National Wildlife Federation, Defendants/Intervenors.

No. Civ 84–105 PHX PGR.

United States District Court,
D. Arizona,
Division Four.

Oct. 1, 1985.

---

* Donald P. Hodel, William Clark's successor as Secretary of the Interior, has been substituted as a party pursuant to F.R.Civ.P. 25(d)(1).

John C. Lacy, Tucson, Ariz., for plaintiff.

John R. Mayfield, Asst. U.S. Atty., Phoenix, Ariz., for defendants.

Kimberly J. Graber, Phoenix, Ariz., for defendants/intervenors.

## MEMORANDUM OPINION

ROSENBLATT, District Judge.

The plaintiff in this action, Pathfinder Mines Corporation, is a mining company that has filed 22 mining claims within the boundaries of the Grand Canyon National Game Preserve (hereinafter Game Preserve). Those mining claims were declared void *ab initio* by the Chief of the Branch of Lands and Mineral Operations, Arizona Office of the Bureau of Land Management, Department of Interior. That decision was affirmed by the Interior Board of Land Appeals of the Department of the Interior (hereinafter IBLA). That body replaced the Director of the Bureau of Land Management (BLM) and the Secretary of the Interior as the appellate administrative body that reviews mineral locations and patent applications.

The present action is one for review of that decision by the IBLA. A decision of the IBLA body is reviewed by this Court under the standards of the Administrative Procedure Act, 5 U.S.C. §§ 701–706. It comes before this Court on cross motions for summary judgment. In addition to motions from the plaintiff mining company and the defendant Department of the Interior, there is also a motion for summary judgment by the defendants/intervenors, the Arizona Wildlife Federation and the National Wildlife Federation, seeking to have the IBLA decision affirmed. All parties believe that there are no material issues of fact and that this matter may be resolved as a matter of law.

Resolution of this matter requires this Court to construe and evaluate federal legislation and presidential proclamations from near the turn of the century (1893–1906) in order to divine the intent of Congress and President Theodore Roosevelt with respect to mineral entry within the Game Preserve. This is no easy task. The voluminous legislative history that would be generated on legislation of this kind today was not prevalent in that period. The only factual questions herein involve the facts and circumstances surrounding the passage of the legislation and the extent to which those influence this Court's construction of the statutes.

### Decision of the IBLA

The IBLA affirmed the decision of the Chief, Branch of Lands and Mineral Operations that the plaintiff's 22 mining claims were void *ab initio* because the land within the Preserve has been withdrawn from mineral entry. 70 IBLA 264 (1983). It is the position of the Department of the Interior and the IBLA that the creation of the Game Preserve withdrew the lands by implication because mineral entry under the General Mining Laws of 1872 is inconsistent with the purpose of the Preserve.

The IBLA relied primarily on opinions previously issued by the Department of the Interior and the Attorney General and the legislative history of the acts and proclamations. No court has ever considered whether the Game Preserve is closed to mineral entry under the General Mining Laws of 1872.

### Standard of Review

Section 706 of the Administrative Procedure Act, 5 U.S.C. § 706, provides the standard of review.

§ 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning of applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

It is the plaintiff's position that the decision of the IBLA is not in accordance with law and should be set aside under § 706 (2)(A).

The Supreme Court has made the following observation about the court's role in this type of review:

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with it administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Comm'n of Territory of Alaska v. Aragon*, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136. See also e.g., *Gray v. Powell*, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; *Universal Battery Co. v. United States*, 281 U.S. 580, 583, 50 S.Ct. 422, 74 L.Ed. 1051. "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'" *Power Reactor Development Co. v. International Union of Electricians*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924.

*Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

In cases such as this, in which resolution is controlled by the construction of statutes, the Court should look to the face of the act, the surrounding circumstances, and the legislative history with an eye toward determining what congressional intent was. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586, 97 S.Ct. 1361, 1362, 51 L.Ed.2d 660 (1977). "In determining legislative intent, it is necessary to consider the legislation in its historical context and not as if it was passed today." *Ute Indian Tribe v. State of Utah*, 716 F.2d 1298, 1303 (10th Cir.1983) (*citing Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978)). At the same time

(i)t has long been recognized that: increasingly as a statute gains in age ... its language is called upon to deal with circumstances utterly uncontemplated at the time of its passage. Here the quest is not properly for the sense originally intended by the statute, ... but rather for the sense which can be *quarried out of it* in the light of the new situation.... For this reason, generally, a court interpreting a statute should: 'ask itself not only what the legislation means abstractly, or even on the basis of legislative history, but also what it ought to mean in terms of the needs and goals of our present day society. This approach is required by the insuperable difficulties of readjusting old legislation by the legislative process and by the fact that it is obviously impossible to secure an omniscient legislature.'

*West Winds, Inc. v. M.V. Resolute*, 720 F.2d 1097, 1101 (9th Cir.1983) (emphasis in original).

Given these standards, this Court must affirm the decision of the IBLA. The decision is a reasonable and well founded analysis of a difficult problem. When this

Court finds that the IBLA's construction is a reasonable one, it must affirm even if the result is not the one that the Court would have reached if the question was first presented to it. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). There is certainly evidence that supports the position of each party to this dispute, but the evidence in support of the plaintiff's position does not warrant rejection of the departmental interpretation. A review of the relevant arguments demonstrates the reasonableness of the IBLA's approach.

*Discussion*

The Grand Canyon Forest Reserve was first established by Congress in 1893, (27 Stat. 1064, Proclamation No. 45, February 20, 1893), and enlarged in 1905 (34 Stat. 3009, May 6, 1905) and 1906 (34 Stat. 3223, August 8, 1906). On June 6, 1906, Congress passed the authorization act for the establishment of the Grand Canyon Game Preserve (Public Law No. 339, 34 Stat. 607). That act authorized the President "to designate such areas in the Grand Canyon Forest Reserve as should, in his opinion, be set aside for the protection of game and be recognized as a breeding place therefor." *Id.* Pursuant to that authorization, President Theodore Roosevelt issued a proclamation on November 28, 1906, setting aside the area of the Grand Canyon Forest Reserve that lay north and west of the Colorado River. (34 Stat. 3263). This area is known as the North Kaibab today.

On June 4, 1897, Congress passed the Organic Act relating to the management of the National Forest Reserves. (30 Stat. 11, 34–36). That act stated that it was not the purpose or intent of the acts establishing forest reservations to include those lands that would be more valuable for the minerals found on them or for agricultural purposes. It said:

No public forest reservation shall be established, except to improve and protect the forest within the reservation, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States; but it is not the purpose or intent of these provisions, or of the Act providing for such reservations, to authorize the inclusion therein of lands more valuable for the mineral therein, or for agricultural purposes, than for forest purposes.

30 Stat. at 35. Therefore, the Act provided that lands could be eliminated from the reserve if it were found by the Secretary of the Interior with the approval of the President that the land was better suited for mining or agricultural purposes than for timber.[1] No portion of the Grand Canyon National Forest Reserve was ever eliminated under that provision.

▉ Relying on the provisions of the statement of intent in the Organic Act, plaintiff argues that mineral lands within the forest reserve were excluded from the forest reserve and therefore were excluded from the Game Preserve. It is clear, however, that the Act did not exclude mineral lands from the reserves, it merely provided a mechanism for eliminating lands from the reserve.

▉ The plaintiff also argues that, absent a specific prohibition or withdrawal, mineral entry is permitted within the Preserve because it was permitted within the forest reserve from which it was created. Two problems exist with this theory. First, it is unclear the extent to which the Organic Act intended to open the forest reserves to mining. Second, the fact that mining may have been permitted within the reserve does not necessarily mean that it continued to be permissible when it became a game preserve. Setting the land aside as a forest reserve implies some limitation on its use. The additional legislative act of setting the land aside as a game preserve implies even greater restrictions on its use.

The Organic Act had a clause that read:

Nor shall anything herein prohibit any person from entering upon such forest

---

1. 30 Stat. 35 (1897).

reservations for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof: *Provided* That such persons comply with the rules and regulations covering such forest reservations. 30 Stat. at 36. Historical materials clearly indicate that the terms of the Organic Act were the result of substantial controversy and compromise. *E.g., J. Ise, The United States Forest Policy,* 125–138 (1920); Pinchot, *Mining and the Forest Reserves,* 28 *Trans. of American Institute of Mining Engineers* 339 (1898). Toward that end, it appears that Congress was intentionally obscure to placate the various competing interests at that time. It was a compromise between the conservationists and the western interests, particularly the miners, who felt that they had been shut out of vast portions of western land by the various acts establishing forest reserves. Such a compromise was probably necessary to prevent the forest reserves from being abolished. *Cf. id.* It is clear, however, that unlimited mining under the General Mining Laws of 1872 was not contemplated. Prospecting, locating and develop-

ing were limited to the extent that they had to be done in conformity with the rules and regulations covering forest reservations. 30 Stat. at 35; *United States v. Weiss,* 642 F.2d 296 (9th Cir.1981). Unquestionably, some amount of mining was permitted under the terms of the Act. Unfortunately, this does not resolve the second problem. It does not follow that mining was permitted within the Game Preserve merely because it may have been permissible within the Forest Reserve.

Neither the act authorizing the Game Preserve nor the proclamation creating it makes any specific reference to withdrawal of the lands from mineral entry.[2] Plaintiff argues that the withdrawal must be explicit, and that the absence of such a withdrawal means that mineral entry continued to be permissible. In support of this contention, the plaintiff cites an Interior Department opinion which states that authority to withdraw land

> must be found in some provision of law which grants it or plainly recognizes it either by express terms or by inference so strong as to clearly indicate an intention to grant or recognize it.

2. Quoting largely from the authorizing act (34 Stat. 607), the proclamation said:

> Whereas, it is provided by the Act of Congress, approved June twenty-ninth, nineteen hundred and six, entitled "An Act for the protection of wild animals in the Grand Canyon Forest Reserve," "That the President of the United States is hereby authorized to designate such areas in the Grand Canyon Forest Reserve as should, in his opinion, be set aside for the protection of game animals and be recognized as a breeding place therefor.
> "Sec. 2. That when such areas have been designated as provided in section one of this Act, hunting, trapping, killing, or capturing of game animals upon the lands of the United States within the limits of said areas shall be unlawful, except under such regulations as may be prescribed from time to time by the Secretary of Agriculture; and any person violating such regulations or the provisions of this Act shall be deemed guilty of a misdemeanor, and shall, upon conviction in any United States court of competent jurisdiction, be fined in a sum not exceeding one thousand dollars, or by imprisonment for a period not exceeding one year, or shall suffer both fine and imprisonment, in the discretion of the court.

> "Sec. 3. That it is the purpose of this Act to protect from trespass the public lands of the United States and the game animals which may be thereon, and not to interfere with the operation of the local game laws as affecting private, State, or Territorial lands";
> And whereas, for the purpose of giving this Act effect, it appears desirable that a part of the Grand Canyon Forest Reserve be declared a Game Preserve;
> Now, therefore, I, Theodore Roosevelt, President of the United States, by virtue of the power in me vested by the aforesaid Act of Congress, do hereby make known and proclaim that all those lands within the Grand Canyon Forest Reserve, lying north and west of the Colorado River, in the Territory of Arizona, are designated and set aside for the protection of game animals, and shall be recognized as a breeding place therefor, and that the hunting, trapping, killing or capturing of game animals upon the lands of the United States within the limits of said area is unlawful, except under such regulations as may be prescribed from time to time by the Secretary of Agriculture.
> 34 Stat. 3263 (1906).

*Authority to Withdraw Lands Within a Forest Reserve*, 35 L.D. 262, 265 (1906).

 The IBLA correctly held, however, that absence of an express provision withdrawing lands from mineral entry is not conclusive. The IBLA noted that a number of decisions make it clear that a statute or order may close land to mineral entry without expressly mentioning the mining laws. 70 IBLA at 269. One such decision is *A. Jackson Birdsell*, A–255440 (January 31, 1949). That case involved the Custer Park Game Sanctuary which was authorized by an act in 1920 which made no specific reference to the mining laws. Nonetheless, it was held that the establishment of the game sanctuary resulted in the withdrawal of the lands from mineral entry. The language of the act creating the Custer Sanctuary is very similar to that creating the Grand Canyon Game Preserve. *Compare* 41 Stat. 986 (June 5, 1920) with 34 Stat. 3263 (November 28, 1906). The Custer Sanctuary, later renamed Norbeck Wildlife Preserve, was recognized by Congress as closed to mineral entry when, in 1948, a statute was passed that specifically permitted mining, but with numerous restrictions. Act of June 24, 1941, *as amended* 16 U.S.C. § 678a (1976). Had the area been open to mining, it would not have been necessary to pass a statute permitting it.

The *Birdsell* court relied in part on the analysis in a 1941 decision concerning the applicability of mining laws to revested grant lands in Coos Bay, Oregon which were to be managed for permanent timber production. *Applicability of Mining Laws to Revested Oregon and California Reconveyed Coos Bay Grant Lands*, 57 I.D. 365 (1941) (hereinafter *Instructions* ). The department noted in that case that the purpose of the legislation could be thwarted by full exercise of rights under the mining laws. The IBLA decision herein relied on the following significant passage from the *Instructions* decision.

> *While the policy is well established that mineral lands are not to be sold or otherwise disposed of except by express provisions of law, the Department is*

*not aware of any established or stable public policy that lands set aside for particular public uses and purposes under any acts of Congress, which neither expressly exclude nor include mineral lands, are to be construed as subject to the mineral land laws. To the contrary, in many instances public lands reserved or withdrawn for sundry public uses and purposes by acts or pursuant to acts of Congress which do not in terms expressly include mineral lands, and likewise lands reserved or withdrawn by the President by virtue of his inherent power, which contain no reference to mineral land, are not subject to the operation of the mineral land laws.* Among these instances of reserves where mineral exploration, location and development are not expressly inhibited but are not permitted, may be mentioned military reservations (17 Op. Atty.Gen. 230); national monuments created under the act of June 8, 1906 (34 Stat. 225); *Cameron vs. United States*, 252 U.S. 450 [40 S.Ct. 410, 64 L.Ed. 659]. The various acts creating bird and game reserves (16 U.S.C. ch. 7) do not expressly forbid mineral location and entry or operations under the mineral land laws, nevertheless applications for permits under the General Leasing Act have been denied on such reserves where the operations would jeopardize or impair (*J.D. Mell et al.*, 50 L.D. 308), or destroy (*R.G. Folk*, A. 20601, unreported, decided March 4, 1937) the usefulness of the reserve as a wildlife refuge. Mineral lands within withdrawals for stock-driveway purposes made under section 10 of the act of December 29, 1916 (39 Stat. 862), became subject to the mining laws under rules, regulations and restrictions provided by the act of January 29, 1929 (45 Stat. 1144). See 43 CFR 185.35. And likewise mineral land included in withdrawals for construction purposes under the reclamation act of June 17, 1902 (32 Stat. 388), were by the act of April 23, 1932 (47 Stat. 136), made subject to location and entry and patent under the mining laws in the discretion of the Secre-

tary where the rights of the United States would not be prejudiced, with reservation of such rights, ways and easements necessary to the protection of the irrigation interests.

While in the National Forest Act the Congress expressly opened the land to the miner, and other acts, such as the act of June 25, 1910 (36 Stat. 847), as amended by the act of August 24, 1912 (37 Stat. 497), opened the withdrawals made thereunder to the miner of metalliferous minerals, the acts creating the national parks in the public land States have closed the door to the miner in such parks. See 16 U.S.C. secs. 21 to 355, inclusive; Lindley on Mines, sec. 196. *As to acts setting aside lands for particular public purposes which do not expressly extend or prohibit the operation of the mineral land laws, there is no sufficient basis for the presumption that the mineral land laws, unless there are express words of exclusion, extend to them. On the contrary, in all such cases the intent of Congress in that respect must be gathered from the act itself.*

(emphasis supplied by the IBLA, 57 I.D. at 372–73).

To refute these cases, the plaintiff relies primarily on the argument that the language of the authorizing statute does not indicate an intention to withdraw the lands from mineral entry and cites instances where very specific language was used. E.g., 26 Stat. 478 (Sept. 25, 1890) (establishing Sequoia and General Grant National Parks). The inference that the plaintiff urges on the Court is that when Congress wanted to completely withdraw land from mineral entry it knew how to do so, and therefore this Court must assume that it meant to do something less in this case. In light of the above referenced case law, the IBLA was reasonable in rejecting this view.

The legislative history in this case is not very helpful in determining the intent of Congress. All the parties to this dispute rely on the legislative history of the authorizing acts in support of their positions. The available legislative history consists of brief House [3] and Senate [4] reports. H.R.

3. REPORT [H.R.Rep. No. 4973] (To accompany S. 2732)

The Committee on the Public Lands, to whom was referred Senate bill 2732, having had the same under consideration, respectfully submit the following report:

This bill is substantially in the same form as the act authorizing the designation of the Wichita Forest Reserve as a game refuge.

This land is all public land, is now in a state of reserve, and is protected by Federal custodians. To protect the animals and birds in this forest, as well as the forest itself, would therefore not involve additional expense.

It would be an advantage to all the people of that Territory and in no wise interfere with the use of the forest reserve. The Department of Agriculture could also obtain supplies there for purposes of propagation in other parts of the country.

The President in his message to Congress called attention to the propriety of making some havens of refuge for the surviving wild birds, game, and fish within these reserves. He said:

"Certain of the forest reserves should also be made preserves for the wild forest creatures. All of the reserves should be better protected from fires. Many of them need special protection because of the great injury done by live stock, above all by sheep. The increase in deer, elk, and other animals in the Yellowstone Park shows what may be expected when other mountain forests are properly protected by law and properly guarded. Some of these areas have been so denuded of surface vegetation by overgrazing that the ground-breeding birds, including grouse and quail, and many mammals, including deer, have been exterminated or driven away. At the same time the water-storing capacity of the surface has been decreased or destroyed, thus promoting floods in times of rain and diminishing the flow of streams between rains.

In cases where natural conditions have been restored for a few years, vegetation has again carpeted the ground, birds and deer are coming back, and hundreds of persons, especially from the immediate neighborhood, come each summer to enjoy the privilege of camping. Some at least of the forest reserves should afford perpetual protection to the native fauna and flora, safe havens of refuge to our rapidly diminishing wild animals of the larger kinds, and free camping grounds for the ever increasing numbers of men and women who have learned to find rest, health and recreation in the splendid forests and flower-clad meadows of our mountains. The

Rep. No. 4973, 59th Cong., 1st Sess. (1906); S.Rep. No. 1586, 59th Cong., 1st Sess. (1906). Like the Act itself, neither report directly addresses the subject of mineral entry. Plaintiff argues that the failure to mention it is indicative of a lack of intent to withdraw the lands. Furthermore, the House report, quoting a speech by President Roosevelt, specifically addresses other threats to wildlife including overgrazing and fire, but not mining. H.R.Rep. No. 4973 at 2. Again, the plaintiff argues that the exclusion should be taken to mean that neither the President nor Congress considered open mining any threat to the wildlife within the Preserve. Both reports also mention that setting aside part of the forest reserve would not impair it for any of the purposes for which it was already set apart. The plaintiff argues that this, by virtue of the Organic Act, includes mining. Even if mining was not prohibited within the forest reserves, it was hardly a use for which the forest reserves were set aside.

■ The IBLA opinion stresses that in looking for congressional intent on mineral entry, a court should consider the extent to which allowing mineral entry would frustrate the purposes that *were* addressed by Congress. 70 IBLA at 272. First, the

> forest reserves should be set apart forever for the use and benefit of our people as a whole and not sacrificed to the shortsighted greed of a few.
>
> The forests are natural reservoirs. By restraining the streams in flood and replenishing them in drought they make possible the use of waters otherwise wasted. They prevent the soil from washing, and so protect the storage reservoirs from filling up with silt. Forest conservation is therefore an essential condition of water conservation."
>
> The protection of game in this reserve will in no wise impair the use of the forest reserve for any of the uses to which it is already set apart, and will prevent the extermination of the small remains of harmless wild life now found therein.
>
> Your committee recommends that the bill do pass without amendment.

4. REPORT [S.Rep. No. 1586] (To accompany S. 2732)

> The Committee on Forest Reservations and the Protection of Game, to whom was referred the bill (S. 2732) providing for the protection of wild animals in the Grand Canyon Forest Reserve, have examined the bill and herewith report the same with the recommendation that it be passed without amendment.
>
> The Grand Canyon Forest Reserve has been set apart in northern Arizona. This tract of land is the only timbered portion of what is known as the Arizona Strip, north and west of the Colorado River. It can not be utilized for agricultural purposes, as there is not sufficient water available. It has been set apart as a permanent timber reserve.
>
> The bill proposes to permit the President of the United States to designate as a game preserve for animals such part of the said reserve as in his opinion may be proper. In one of his messages the President asked that authority be given, as to all the forest reserves in the United States, for the Executive to designate areas thereof as havens of refuge for the small remaining portion of our game and birds. Thus far Congress has not enacted a general law on the subject.
>
> The bill applies only to the Grand Canyon Forest Reserve, and no opposition thereto has been expressed from any part of the country affected thereby. The committee understand that the sentiment is unanimously in favor of this action, in that it will protect from hunters some suitable portion of that region, to be used as a refuge and breeding ground for game animals, which are being reduced in number by reason of having no such protection and whose existence it is beneficial to maintain.
>
> The Grand Canyon Forest Reserve is so provided with natural facilities of protection that an area therein suitable for the purposes of this bill can be inclosed safely by 16 miles of fence in addition to natural barriers that now protect it on three sides. The Colorado and Kanab Creek now form impassable barriers on the east, west and south sides of an area on the north side of which high cliffs and 16 miles of fence would make an inclosure where game animals can be kept and protected.
>
> The spot is ideal for buffalo, deer, and other wild game. The land is all public land, is in a state of reserve, and is protected by Federal custodians, so that in this regard the protection of animals in the forest will not involve additional expense. There will be no interference with the use of the forest reserve in respect to its general purpose while the establishment of such a game preserve in that place would be beneficial, both in aiding to provide the Department of Agriculture with supplies for purposes of propagation elsewhere and in being generally advantageous to the public interests so far as these are subserved by the protection and propagation of desirable species of game animals in the United States.

IBLA notes that it must be assumed that those miners making entry under the General Mining Laws of 1872 would take full advantage of the privileges provided thereby. *Id.* at 273. Entry under that law does not restrict the manner in which mining can be done and would result in eventual alienation of title from the government by patent. The IBLA noted that in instances where mining has been allowed in various wildlife areas around the country and within the Grand Canyon Game Preserve, it has been on a restrictive basis. *Id.; see e.g.,* Act of June 24, 1941, *as amended* 16 U.S.C. § 678 (1976). The entry sought by the plaintiff would have no such restrictions and therefore is irreconcilable with the purpose of the Game Preserve. It does not make sense for the government to set side land for a particular purpose and thereafter permit piecemeal alienation of it. In other words, it is conceivable that multiple use could be made of the land, but it is impracticable when it would result in alienation of title.

The defendants and intervenors have included in the record substantial discussion and evidence about the potential adverse impact that mining could have on the wildlife population. There are affidavits from various experts that the mining activity that could result under the general mining laws with all the claims that have been filed could have a substantial adverse impact on the area.[5] This evidence is not very probative of the intent of Congress in establishing the Preserve. It does illustrate, however, the illogic of establishing a game preserve without limitation of general mining entry, and that can be used to infer that Congress would not have intended such a result. *See, West Winds, Inc. v. M. v. Resolute,* 720 F.2d 1097, 1101 (9th Cir.1983).

The plaintiff has also argued that if the statute and proclamation establishing the Game Preserve is considered to be ambiguous, then they should be interpreted by examining the application of it by the Interior Department in the years immediately following enactment. It is in this area of evidence that the decision of the Interior Department is entitled to the greatest deference. The IBLA is better equipped than this Court to evaluate the significance of prior agency action.

The plaintiff points out that a small number of mining patents for land located within the Game Preserve were issued in the years following the Preserve's establishment, and argues that these are evidence that the Interior Department officials issuing the patents believed, contemporaneously, that the land was open to mineral entry. Contemporaneous construction by the department is, of course, entitled to special deference. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). The plaintiff contends that "the Department of the Interior has the power and the duty to inquire into and to adjudicate all matters relating to the right of an applicant to receive a patent." 3 *Am.L. of Mining,* § 9.04 (Rocky Mountain Mineral Law Foundation, 1st Ed.1983). The defendants do not dispute this principle, but argue that the few patents issued in this case were the result of either administrative error or the result of valid pre-existing rights.[6] There is a factual dispute, not resolved by the IBLA, about whether it is possible for the patents issued within the Preserve to have been the result of pre-existing rights, but it is neither necessary nor appropriate for this Court to resolve that dispute at this time. It appears unlikely that the issue could ever be conclusively resolved.

In any event all the previously patented lands within the Preserve have been reacquired[7] so that the entire Preserve is a

5. The pleadings revealed that by the time these motions were filed, 2247 claims had been filed within the Preserve.

6. The statutes and proclamations first establishing the forest reserve provided for the exclusion of pre-existing rights.

7. There is no evidence in the record about how or why these parcels were reacquired.

contiguous and uninterrupted area to be managed for the benefit of wildlife. As noted by the IBLA, this suggests the futility of a policy that permits mineral entry and subsequent patenting only to have the government forced to reacquire the land to put it to the use for which it was originally set apart, and then to have it again subject to entry. 70 IBLA at 281.

As further evidence of a departmental belief that the Game Preserve was open to mineral entry, the plaintiff notes that in 1909 the Forest Service withdrew from mineral entry a one acre parcel within the Game Preserve for use as an administrative site. The plaintiff argues that the withdrawal would not have been necessary if the Game Preserve was already withdrawn from mineral entry. The defendants speculate that the withdrawal was accomplished as a routine administrative matter like many other withdrawals from forest service lands required for administrative sites and that the paperwork was merely copied without deletion of the portions relating to mineral entry. Furthermore, the mineral withdrawal was later determined to be unnecessary and was revoked. Tr. 237. The IBLA did not adopt the speculation of the defendants, but did not consider the withdrawal very probative, "as it indicates no conscious determination of its prior status." 70 IBLA at 280. This Court agrees, especially in light of the later revocation.

■ The plaintiff also noted that the public records in the Arizona State Office of the BLM showed the land within the Game Preserve as open to mineral entry until 1981. The Secretary claims that it was merely an error and that when the mistake was recognized the records were corrected to show an effective withdrawal date of 1906, the year the Preserve was established. The plaintiff was told of the mistake before it placed its claims. It does not advance a reliance argument. The IBLA noted that a mining claim located on withdrawn land is null and void even if the land records erroneously indicate that the

land is open. *See Rod Knight*, 30 IBLA 224 (1977).

The plaintiff also relies on a 1941 letter from the Arizona BLM office indicating a belief that game preserves in general were open to mineral entry. That letter was equivocal at best, indicating that the inquirer should provide a specific location to be sure. Tr. 36. This letter is hardly probative of a departmental determination that mineral entry was permissible within the Grand Canyon Game Preserve.

In response to the items cited by the plaintiff as evidence of a departmental belief that the Game Preserve was open to mineral entry, the defendants cite a large amount of correspondence and official opinion that the Game Preserve is closed to mineral entry. The first record found showing that the matter of mineral entry within the Preserve was considered at any high level of the Department of Interior is in a letter from Assistant Secretary of the Interior Orme Lewis to the Director of Mineral Resources, State of Arizona. The letter, dated January 4, 1955, has not been located but was referred to by Mr. L.K. Louma, Field Solicitor of the BLM, in a later opinion. Tr. 85–86. The Assistant Secretary opined that the Game Preserve was not open to mineral entry. He relied on a 1938 opinion of the Attorney General that the Wichita National Game Preserve, established by nearly identical language contemporaneously with the Grand Canyon Game Preserve, was closed to mineral entry. 38 Op. Att'y Gen. 192. He also relied on the *Birdsell* opinion discussed *supra*. The Field Solicitor's opinion citing the Lewis letter reached the same conclusion. Tr. 85–86.

Other correspondence evidencing a departmental belief that the Game Preserve was withdrawn from mineral entry is found in Tr. 87–88, 89–90, 94, 182, 184–185, 199, 210–211, 226–227, 236–240, 244, 246–247, 251, 253 and 325. It can be fairly stated that both the Department of Interior (Bureau of Land Management) and the Forest Service have consistently maintained since at least 1930 that the Preserve is, and has

**346**

been, closed to mineral entry since its establishment in 1906.[8]

*Conclusion*

Despite the lack of specific reference to the mining laws in the authorizing legislation, this Court is persuaded that Congress would not set aside land for the purpose of wildlife protection without intending to protect that land from piecemeal alienation under the general mining laws. It is true that some mining has occurred within the Preserve throughout the decades since its establishment, but virtually none of that was under the General Mining Laws of 1872 resulting in alienation of title from the government. Evidence that the Game Preserve has been managed under the concept of multiple use is not evidence that open mining has been, or should be, allowed under the general mining laws. Other provisions in the law, such as mineral leasing, permit mining that can be controlled so as to minimize the impact on the purpose for which the land was set apart and does not result in alienation of title. Those few mining claims that were allowed to go to patent, whether by administrative oversight or otherwise, have been reacquired. Therefore, the decision of the IBLA is

AFFIRMED.

---

**8.** The plaintiff makes the argument that the government's position that the Preserve is closed is based on departmental confusion about the difference between a game refuge and a game preserve. The Wildlife Refuge System, as presently constituted, was created in 1966 when Congress passed an act consolidating many wildlife areas into one system for management. *See* 16 U.S.C. § 668dd. The Grand Canyon National Game Preserve is not part of that system. Lands within the Refuge System are clearly not open to mineral entry. 50 C.F.R. § 27.64. The plaintiff is undoubtedly correct that the rules governing refuges should not be used to establish that the Preserve is closed. On the other hand, the fact that the Preserve is not part of the Refuge System is not evidence that it is open to mineral entry.