McKAY, Circuit Judge.
Multiple environmental groups challenged management plans approved by the U.S. Forest Service authorizing two commercial timber sales in the Norbeck Wildlife Preserve in the Black Hills of South Dakota. After exhausting their administrative remedies, the plaintiffs brought suit in federal district court alleging that the Forest Service failed to comply with both administrative law and the National Environmental Policy Act [NEPA], and, additionally, that the harvest plans violate the Norbeck Organic Act. The district court ruled against them and dismissed Plaintiffs’ Complaint with prejudice. This appeal followed. We have jurisdiction over the final decisions of district courts under 28 U.S.C. § 1291.
Originally named the Custer State Park Game Sanctuary, the Norbeck Wildlife Preserve was created by Congress in 1920. The Forest Service currently manages approximately 28,000 of the Preserve’s 34,873 acres.[1] The diverse geography ranges in elevation from 4,500 to 7,242 feet, providing habitat to multiple game animals, such as elk, deer, and mountain goats; over fifty bird species, including species of nuthatch and woodpeckers, the northern goshawk, ruffed grouse and Merriam’s turkey;[2] brook trout and other fish species; and to various non-game animals.
The Forest Service endeavors to manage habitat for breeding, feeding, hiding, and resting for this myriad of animal species, while also optimizing vegetative diversity. Habitat management is a delicate venture. Successful management necessitates a precarious balancing of the environmental impacts occasioned by geographical features such as meadows, undergrowth, timber stands, roads, and wat-erflow. For example, some species are sustained by mature to old-growth timber stands, while others need early succes-sional forest stages. After considering many countervailing factors, the Forest Service approved the timber harvest plans now at issue for the Needles and Grizzly areas of the Norbeck Preserve.
This is not the first time that timber harvests have been planned for the Nor-beck Preserve. In 1927, the Forest Service developed a Master Plan for managing the Preserve, and regulated timber harvests were included. See Aplee. Supp. App. at 6. That Master Plan specified that timber cutting would be “without material interference with the game” and expressly reinforced that wildlife preservation remained the “primary purpose” and “dominant activity” of preserve management. Id. at 6-11. In 1948, Congress authorized mining within the Preserve and acknowledged that timber clearing was incidental to that use. 16 U.S.C. § 678(a). Substantial commercial timber harvests were proposed in 1973 and 1986, but, after lengthy administrative and court proceedings, neither proposal reached fruition. The course of those proceedings yielded a Final *1285 Supplemental Environmental Impact Statement (FSEIS) that forms the eviden-tiary basis for the current harvest plans.
The Forest Service does not assert that the 1927 Master Plan nor the 1948 mining exemption authorize the proposed timber sales from the Needles and Grizzly areas. Instead, the Service asserts that the comprehensive Black Hills National Forest Land and Resource Master Plan, approved in 1983, authorizes the current management plans, of which the timber sales are a part. The Service enacted the 1983 Plan pursuant to the National Forest Management Act [NFMA]. See 16 U.S.C. § 1604 et seq.[3] Accordingly, the 1983 Plan overtly effectuates the NFMA mandate to optimize overall wildlife, fish, and vegetative habitat diversity. See § 1604(g)(3)(B); 36 C.F.R. § 219.27(g). Consequently, under the 1983 plan, the management emphasis for the Norbeck Preserve became the optimization of overall habitat capability, thus extending management decisions beyond the parameters of the Norbeck Organic Act. See Aplee. Supp.App. at 14 (1983 Plan).
Apart from the NFMA and its mandate to optimize overall diversity, the Norbeck Organic Act specifically designates the Norbeck Wildlife Preserve more narrowly “for the protection of game animals and birds and ... as a breeding place thereof.” 16 U.S.C. § 675. Under the Norbeck Act, timber harvests are permitted in limited situations: “[EJxcept where clearing is necessary in connection with mining operations, ... no use of the surface of the claim or the resources therefrom, ... shall be allowed except under the national-forest rules and regulations.... ” 16 U.S.C. § 678(a). In this case, the district court upheld the agency’s management plans after finding them in compliance with the rules and regulations of the National Environmental Policy Act [NEPA]. 42 U.S.C. § 4321 et seq.
The record reveals that the proposed harvest plans will yield approximately 13.5 million board feet of timber from over 3,700 acres of the Preserve. To facilitate those harvests, there will be an accompanying 32.9 miles of road construction. It is not disputed that, besides other environmental impacts, the harvests and road construction will significantly reduce the percentage of big-game hiding cover to as low as twenty-seven percent of the project area.[4] The record reveals that the agency is aware the harvests and accompanying road construction will cause “wildlife disturbance,” but the agency justifies the plans by relying on mitigation measures oriented toward overall habitat diversity. Aplt.App. at 29 (Record of Decision). Furthermore, the agency recognizes that the balancing of all interests “may be detrimental to the continued presence of some habitat specialists, especially species requiring larger tracts of forest or interior habitat conditions.” Aplee. SuppApp. at 56A (1992 FSEIS). Notably, “habitat specialists” include bird species dependent on pine stands in mature and old-growth forest. See id. at 44-45. That grouping encompasses woodpeckers and goshawks, both of which have been classified as sensitive species based on their population statuses. See supra note 2. Again, the agency relies on the NFMA interest of overall plant and animal diversity to justify the *1286 fact that certain species might be compromised, including some already jeopardized.
Appellees argue that the Forest Service “has reasonably interpreted the Norbeck Act as permitting it to manage the Preserve for overall habitat and vegetative diversity, recognizing a special emphasis on game animals and birds, but creating favorable habitat conditions for wildlife generally.” Aplee. Br. at 42-43. In other words, Appellees have interpreted the Norbeck Act to be supplemental or subordinate to the NFMA. Appellees assert that we should defer to the agency’s interpretation of its management mandate and in doing so imply that agency discretion extends to the determination of which among various statutes govern agency action.
Indeed, we defer to agency interpretation of congressionally delegated mandates. See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); see also Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 376-77, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (emphasizing that deference is particularly appropriate when an interpretation implicates scientific and technical judgments within the scope of agency expertise). Deferring to an interpretation of a known but ambiguous mandate, however, is strikingly different than deferring to the determination of which among various statutes constitutes the mandate of Congress. We do not pay deference to an agency’s interpretation of what law is applicable; in this case, that means we do not defer to the agency’s interpretation of how one Act (NFMA) affects the scope of another (Nor-beck Act). See Cascade Natural Gas Corp. v. F.E.R.C., 955 F.2d 1412, 1415 (10th Cir.1992) (reiterating that court is “under no obligation to defer to the agency’s legal conclusions”). In this case, we must first decide whether and how other congressional acts, namely the NFMA and the NEPA, affect the Norbeck Act’s special mandate.
Appellees assert that “this Court need not decide the relationship between the NFMA and the Norbeck Act because the Sierra Club’s arguments in this case can be rejected based solely on the Norbeck Act.” Aplee. Br. at 43 n. 16. We disagree. The agency’s consistent recitation and reliance upon “overall diversity” and other terms extraneous to the Norbeck Act make clear that the agency itself did not rely solely on the Norbeck Act in approving the commercial timber harvest plans. Appellees remark that “[t]his is not a case in which the Forest Service is balancing competing habitat needs of ‘game animals and birds’ on the one hand, against habitat needs of other wildlife species on the other.” Id. Again, we disagree. The agency’s record leaves no doubt that this is precisely that kind of balancing case. In the agency’s words:
Managing the Norbeck Wildlife Preserve to create this habitat diversity means balancing the conflicts between creating more edge and minimizing fragmentation. On the one hand, edges promote habitat and species richness, and favor many game and non-game species. On the other hand, those same edges (and the habitat fragmentation they create) may be detrimental to the continued presence of some habitat specialists....
Aplee. Supp.App. at 56A. Indeed, we must determine whether the Norbeck Act allows that kind of overall interest balancing.
Our research confirms Appellants’ assertion that no court has interpreted the Nor-beck Act, making this case one of first impression. However, we clarify that we are not wholly without guidance because similar special-mandate statutes have been reviewed. Reviewing the mining law of the Grand Canyon Game Preserve and making an explicit comparison to the Norbeck Pre *1287 serve, one court reasoned that activities like mining or timber harvesting are not permitted in these special preserves unless they are expressly allowed by statute. See Pathfinder Mines Corp. v. Clark, 620 F.Supp. 336, 341 (D.C.Ariz.1985). In cases more recent and more directly on point, environmental groups have litigated proposed timber sales in the Ozark National Forest. See Kuff v. United States Forest Serv., 22 F.Supp.2d 987 (W.D.Ark.1998); Gregson v. United States Forestry Serv., 19 F.Supp.2d 925 (E.D.Ark.1998). Although these cases do not resolve the final question we address in this appeal, they are instructive to the extent that they explain the connections between the NEPA, the NFMA, and the management of preserves governed by special mandates.
Without further discussion, we agree with these previous cases that the “NEPA itself does not mandate particular results but simply prescribes the necessary process.” Kuff, 22 F.Supp.2d at 989 (citing Inland Empire Public Lands Council v. United States Forest Serv., 88 F.3d 754, 758 (9th Cir.1996), and Simmons v. United States Army Corps of Eng’rs, 120 F.3d 664, 666 (7th Cir.1997)). We also agree that the Forest Service may treat the NFMA as a “substantive statute under which the Forest Service is acting” even in the management of specially designated preserves. Kuff, 22 F.Supp.2d at 989. It is conceivable that in many cases, and hopefully most cases, the NFMA mandate to preserve overall diversity will work in concert with the more specific mandate of a special preserve. The question we must address, however, is which statute controls when the intersection of two or more mandates results in compromising a specifically applicable statute. In particular, we must resolve whether the broad overall diversity standards of the NFMA can be interpreted to overbalance and thereby effectively negate the specific game animal and bird duty imposed by the Norbeck Act.
It is a “fundamental .tenet of statutory construction that a court should not construe a general statute to eviscerate a statute of specific effect.” State Bank of S. Utah v. Gledhill (In re Gledhill), 76 F.3d 1070, 1078 (10th Cir.1996) (citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)). The provisions of the NFMA apply generally to the 191 million acres of National Forest System, but there are a collection of special preserves with specific management mandates extraneous to the NFMA. See 16 U.S.C. §§ 671-689. These preserves comprise less than .05 percent of the National Forest System. In this limited context, we cannot apply the NFMA mandate in a way that effectively abolishes the specific statutory mandates Congress has established. That is the law even if reason and equity support a different conclusion. See Tennessee Valley Auth. v. Hill, 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Accordingly, we hold that the Norbeck Organic Act governs the management of the Norbeck Preserve, and management plans must comply with its specific mandate.
Given the record before us, the end result of overall diversity does not allow us to assume that the timber harvest plans will protect game animals and birds. There are scattered concessions throughout the record that, although overall diversity will be enhanced, the harvests and road construction will in fact create wildlife disturbances and will have deleterious effects on certain species. Content that proposed harvest plans optimize overall diversity (including vegetative, fish and non-game life), the agency did not specify what it meant by “disturbance” and “deleterious.” See Aplt.App. at 29 and Aplee. Supp.App. at 56A. It is significant that *1288 some of these overbalanced species (birds) have populations already classified as sensitive. Cf. Wyoming Farm Bureau Fed’n v. Babbitt, 199 F.3d 1224, 1237 (10th Cir.2000) (holding that the Endangered Species Act does not countenance a management plan that undermines the recovery of threatened and endangered species). We might eventually confront the question of whether it is acceptable management practice to favor overall vegetative and animal diversity even at the expense of rare species of plants or animals. At present, however, as a matter of statutory interpretation, we hold that the anticipated deleterious effects cannot be answered by general reliance on the NFMA’s broader mandate to protect overall diversity because the Norbeck Act’s specially designated species (game animals and birds) might drop out in such a balancing of collective interests. In light of the Nor-beck Act, we cannot sustain harvest plans that favor vegetative, fish and non-game animal life if they fail to protect game animals and birds, even if optimal diversity is served. The law requires a more specific analysis.
The plain language of the Nor-beck Act requires the protection of game animals and birds, not the overall protection of all plant and animal species. See Sundance Assocs., Inc. v. Reno, 139 F.3d 804, 808 (10th Cir.1998) (holding that, notwithstanding other ambiguities, plain language of statute established a group possibly subject to its requirements). Appellees counter that “protection” is an ambiguous term requiring agency interpretation. We note that the agency did not address whether there are other available habitats for the at-risk rare birds, and we would normally require that type of specific finding with respect to the protection of a rare species. In any event, we agree that there is ambiguity about what “protection” ultimately entails, but hold here that the ambiguity does not extend to the object of protection. On that specific point, game animals and birds are the specially designated species and must be “protected” — not compromised — in a balancing of interests.[5]
We restate that we are not impinging agency discretion by directing the Forest Service to reconsider its harvest plans in light of the narrow parameters established by the Norbeck Act. Our holding is premised simply on the fact that the Norbeck Act, unless modified by Congress, contains a special mandate that must be given full force. That is true even if the Norbeck Act’s narrow mandate to protect game animals and birds prevents maximization of other mandates, namely, the NFMA mandate to preserve overall diversity. Cf. Sierra Club v. Espy, 38 F.3d 792, 798-800 (5th Cir.1994) (recognizing that required substantive decisions may constrain the ability to maximize the mandate of NFMA). The Forest Service can *1289 continue to establish management plans under both the Norbeck Act and the NFMA, but the NFMA mandate must be supplemental and may not diminish (through balancing) the more specific mandate of the Norbeck Act.
During our careful review of the record, we have observed that because the agency paid special attention to game animals and birds, there is room to argue that the harvest plans might, in fact, satisfy the demands of the Norbeck Act. Conversely, as we have pointed out, the record also gives reason to believe that the timber harvest plans fail to satisfy that directive. In any event, we recognize that the actual effect of harvest plans on specified habitats is the kind of scientific determination for which we should not substitute our judgment in the place of a clear determination by an agency with specialized expertise. See Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). When the agency record is inadequate, “the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.” Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). We find this record inadequate because the agency justified its plans against a standard that authorizes management practices that would not be authorized by the controlling Norbeck Act. Contrary to Appellees’ assertion, we hold that as a matter of law the NFMA is supplemental or subordinate to the specific mandate of the Norbeck Act.
It is clear to us that the agency approved the harvest plan because it fulfilled the NFMA goal of overall diversity. Certain bird species, some of them already rare, might have dropped out in that analysis. For the harvest plans to be consistent with law, they must, nonetheless, satisfy the Norbeck mandate. We cannot assume that to be true simply because overall diversity has been optimized. On remand, the agency must justify the proposed timber harvests not by showing that optimal diversity is served generally, but by showing specifically that game animals and birds are protected.
Accordingly, we REVERSE and REMAND for further proceedings.

. The Preserve consists of predominately public lands, but it contains some private lands.

. We note that among those birds the pygmy nuthatch is listed by the state of South Dakota as Critically Rare. Also, owing to population concerns, the three-toed and black-backed woodpeckers and the northern goshawk are classified by the Forest Service as Sensitive Species. See Aplt. Br. at 5 with uncontested citation to the Administrative Record.

. Title 16 U.S.C. § 1604(f)(5) requires revision of management plans at least every fifteen years. The parties concede that modifications effective in the 1997 management plan do not affect the decisions at issue in this litigation.

. Appellant alleges that the Forest Service twice lowered the required Forest Plan standard for big game hiding cover from fifty percent of the project area “so that the Needles sale would not violate the agency's own protective standard.” Aplt. Brief at 8-9.

. Admittedly, that language is potentially ambiguous in the sense that "game animals and game birds" are not necessarily the same objects of protection as "game animals and birds.” Additionally, protection of populations differs from protection of individual animals.. However, because the agency justified its plans pursuant to broader NFMA principles, it did not address those specific interpretive questions and we leave them for the agency to address in the first instance. The dissent misses the mark with its criticism on this point. Ambiguity in the Norbeck Act does not justify the agency's protection of vegetative life, fish species and non-game animals to the possible detriment of game animals and birds. The ambiguity is contained and limited by that phrase, "game animals and birds.” On this record, the agency's interpretation is broad enough to tolerate harm done to game animals and birds in pursuit of protecting plant life, fish, and non-game animals. For that reason, the agency's interpretation is patently contradictory to the specific congressional mandate.