**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 7 2002**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STATE OF WYOMING; WYOMING
GOVERNOR, in his official capacity,
a.k.a. Jim Geringer,

    Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA;
GALE A. NORTON, in her official
capacity as Secretary of the United States
Department of the Interior,

    Defendants-Appellees,

and

JACKSON HOLE CONSERVATION
ALLIANCE; GREATER
YELLOWSTONE COALITION;
WILDERNESS SOCIETY,

    Intervenors-Appellees.

---

INTERNATIONAL ASSOCIATION OF
FISH AND WILDLIFE AGENCIES,

    Amicus Curiae.

No. 99-8089

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 98-CV-37-B)**
**(61 F. Supp. 2d 1209)**

Lynda G. Cook, Assistant Attorney General (Gay Woodhouse, Attorney General, and Michael Dinnerstein, Assistant Attorney General, with her on the brief), Cheyenne, Wyoming, for Plantiffs-Appellants.

Lisa E. Jones, Department of Justice (Lois J. Schiffer, Assistant Attorney General, Environment & Natural Resource Division, Department of Justice; Charles R. Shockey and Andrew C. Mergen, Department of Justice, Washington, D.C.; David D. Freudenthal, United States Attorney, and Carol A. Statkus, Assistant United States Attorney, Cheyenne, Wyoming; and Debra Hecox, of Counsel, Office of the Regional Solicitor, Department of the Interior, Lakewood, Colorado, with her on the brief), Washington, D.C., for Defendants-Appellees.

James S. Angell, Earthjustice Legal Defense Fund, Bozeman, Montana, for Intervenors-Appellees.

Paul A. Lenzini of Donelan, Cleary, Wood & Maser, P.C., Washington, D.C., filed an Amicus Curiae brief on behalf of International Association of Fish and Wildlife Agencies in Support of Plaintiffs-Appellants.

Before **LUCERO**, **POLITZ**,[*] and **BALDOCK**, Circuit Judges.

**BALDOCK**, Circuit Judge.

Once again a federal court is called upon to unravel a congressionally-legislated Federal-State standoff. The National Elk Refuge (NER), a part of the National Wildlife Refuge System (NWRS), encompasses approximately 24,700 acres of wilderness north

---

[*] The Honorable Henry A. Politz, United States Senior Circuit Judge for the Fifth Circuit Court of Appeals, sitting by designation.

of Jackson Hole, Wyoming, in the greater Yellowstone area.[1]  Brucellosis, a serious

disease that causes miscarriage, is endemic to free-ranging elk in the greater Yellowstone

area and a threat to Wyoming's domestic cattle industry.  Plaintiff State of Wyoming

and the United States Fish and Wildlife Service (FWS), a division of the United States

Department of the Interior (USDI), disagree over how best to manage brucellosis on the

NER.  Specifically, the State challenges the FWS's refusal to permit the State to vaccinate

elk on the NER with a brucellosis vaccine known as "Strain 19."  According to the FWS,

after several years of research and study, the biosafety and efficacy of Strain 19

vis-a-vis elk remain unproven.  The State disagrees.

Resolution of this matter ultimately rests upon our construction of the National

Wildlife Refuge System Improvement Act of 1997 (NWRSIA), Pub. L. No. 105-57,

111 Stat. 1252-1260 (codified at 16 U.S.C. §§ 668dd-668ee) (as amended) (amending

the National Wildlife Refuge System Administration Act of 1966 (NWRSAA), Pub. L.

No. 89-669, 80 Stat. 926-930 (as amended)).  Unfortunately, the NWRSIA does not (nor

does any federal law) directly address the problem of brucellosis in wildlife, or establish

---

[1]  Today, the NWRS encompasses land in all fifty states, includes over 500
refuges, and consists of nearly 93 million acres.  Pub. L. No. 105-57, § 2(1), 111
Stat. 1252 (1997).  Congress established the NER in 1912, then 2,760 acres, to protect
both human and elk interests in the Jackson Hole valley.  See 16 U.S.C. § 673.  The NER
became a part of the NWRS in 1966.  Numerous species make the NER their home during
part or all of the year.  In addition to elk, these species include birds, bison, mule deer,
bighorn sheep, pronghorn antelope, moose, wolves, coyotes, badgers, and black
and grizzly bears.  See Intvr-Aple's App. at 3-11.

3

clear priority between wildlife and domestic livestock when interests involving the two conflict. In the jurisdictionally-fragmented Yellowstone area, however, one thing is certain: Wildlife management policies affecting the interests of multiple sovereigns demand a high degree of intergovernmental cooperation. Such cooperation is conspicuously absent in this case.

I.

Brucellosis is a disease caused by Brucella abortus, a bacterial borne pathogen which infects the reproductive organs and lymphatic systems of ungulates.[2] Brucellosis most often produces spontaneous abortion in female ungulates during the first pregnancy following infection. A small percentage of infected ungulates may develop inflamed joints resulting in arthritis and lameness. The disease also may produce sterility in infected males. Research has shown that female ungulates are largely responsible for the spread of brucellosis to other susceptible hosts. Aborted fetuses, vaginal fluids, newborn young, birth byproducts, and milk from infected females all are contaminated with the Brucella bacteria. The disease spreads most commonly when ungulates consume infected tissue or contaminated feed or water. See B. Smith & T. Roffe, A Political Disease: Brucellosis, Bugle: The Quarterly Journal of the Rocky

---

[2] An ungulate is defined as "a hoofed mammal." Random House Dictionary 2069 (2d ed. 1987).

Mountain Elk Foundation, Summer 1992, at 71-74.[3]

Authorities first detected brucellosis in elk in the greater Yellowstone area around 1930. Today, brucellosis infects approximately thirty percent of the elk in western Wyoming. Thus, significant levels of brucellosis still occur in the feed ground elk population on the NER. See R. Keiter & P. Froelicher, Bison, Brucellosis, and Law in the Greater Yellowstone Ecosystem, 28 Land & Water L. Rev. 1, 18, 27 (1993). Experts estimate that the annual elk calf loss due to brucellosis-related abortions on the NER is seven percent of the calf crop. See Smith & Roffe, supra, at 76.

The concentration of free-ranging elk herds on Wyoming and NER winter feed grounds appears to perpetuate brucellosis. The feed grounds, which host around 25,000 elk each winter, are prime locations for the transmission of brucellosis because the herds are in close contact during the critical birthing period. See id. at 73, 79. Because natural winter habitat in the region is not adequate to sustain the elk herds at their current numbers, closing the feed grounds would foster competition, which appears to increase the risk of brucellosis transmission. See Keiter & Froelicher, supra, at 60-61.

---

[3] Humans are susceptible to infection from the Brucella bacteria as well. The symptoms of undulant fever, as the disease is known in humans, are flu-like. Most cases of undulant fever, however, are caused by Brucella melitensis, which is found primarily in sheep and goats. The risk of human infection by elk or cattle is possible, but more remote. But see Parker Land and Cattle Co. v. United States, 796 F. Supp. 477, 487 (D. Wyo. 1992) (describing incident where ranch hand contracted undulant fever while assisting in the delivery of calves; "several courses of medication" proved effective in combating the disease). Cooked meat poses no threat of transmitting brucellosis and is considered safe for human consumption. See Smith & Roffe, supra, at 74, 76-77.

The primary significance of brucellosis-related abortions in Wyoming's elk herds is the potential for transmission of the disease to domestic cattle. Elk and other wildlife in the greater Yellowstone area do not respect jurisdictional boundaries. Instead, wildlife wanders freely across the region's public and private lands. Experts explain that the creation of artificial barriers to separate domestic cattle from wild elk is not feasible:

> Natural barriers to prevent commingling of wildlife and cattle do not exist, and artificial barriers, such as fences, have many drawbacks. Wildlife-proof fences, if effective, would interfere with traditional movement and migration routes of elk, bison and other species. The intensive and expensive maintenance required for such a program–and the fidelity of elk and bison to traditional ranges–ensure that this would fail.

Smith & Roffe, supra, at 78.

No documented cases of elk infecting domestic cattle with brucellosis under natural conditions exist. But see Parker Land and Cattle Co. v. United States, 796 F. Supp. 477, 488 (D. Wyo. 1992) (concluding that a brucellosis outbreak in Wyoming cattle "was most likely caused by contact with infected elk or bison, as those are the only two known sources of the disease in the entire State of Wyoming"). Scientists at Texas A&M University, however, have transmitted brucellosis from elk to cattle in confined conditions. Thus, the impetus behind Wyoming's desire to eradicate brucellosis in elk is the potential for economic loss to its domestic cattle industry. Experts estimate that from 1951 to 1981, brucellosis cost the nation's cattle industry $1.6 billion. See Smith & Roffe, supra, at 72-76. Another estimate places that cost at $100 million annually.

6

See Keiter & Froelicher, supra, at 9.

Despite disagreement over how effective the Strain 19 vaccine is in immunizing elk from brucellosis, experts agree that vaccinating cattle with Strain 19 plays an important role, together with test-and-removal of infected animals, in eradicating brucellosis from cattle herds. The vaccine, which has been in use in the cattle industry for several decades, provides approximately seventy percent protection against abortion in vaccinated cattle. Subject to the State's ongoing program of vaccination, and test-and-removal, the National Cooperative Brucellosis Eradication Program of the United States Department of Agriculture (USDA) certified the State of Wyoming's cattle industry as brucellosis-free in 1985. See Smith and Roffe, supra, at 74, 77.[4]

That same year, the State began vaccinating elk with Strain 19 on state feed grounds, apparently with some success. By the early 1990's, Wyoming reported that

---

[4] For over half a century, federal and state officials have worked closely with the nation's domestic livestock industry to eradicate brucellosis in livestock. See generally Keiter & Froelicher, supra, at 21-27. Federal law authorizes the Secretary of the USDA "to control and eradicate any communicable diseases of livestock or poultry, including . . . brucellosis of domestic animals." 21 U.S.C. § 114a. Federal law also authorizes the Secretary to "seize, quarantine, and dispose of" infected livestock moving in interstate commerce. Id. § 134a. The USDA has promulgated regulations pursuant to 21 U.S.C. § 111, establishing a comprehensive brucellosis eradication program. See 9 C.F.R. Part 78. Notably, these regulations do not apply to wild elk. See id. § 78.1 (defining animals as "[c]attle, bison, and swine"). But see 7 U.S.C. § 426 (authorizing the Secretary of the USDA to "determine, demonstrate, and promulgate the best methods of eradication, suppression, or bringing under control on . . . areas of the public domain as well as on State, Territory, or privately owned lands . . . animal injurious to agriculture . . . [and] animal husbandry . . . .").

7

its vaccination program had resulted in a seventy percent calving success rate for vaccinated elk, as compared to a thirty percent calving success rate for unvaccinated elk. See Keiter & Froelicher, supra, at 30 n.199. By 1998, the State was vaccinating elk on twenty-one of twenty-two state feed grounds without notable adverse consequence. See Aplt's App. at 187. Since 1985, however, at least four documented incidents of brucellosis in Wyoming cattle have occurred. The source of the disease in these cases remains unidentified. See Smith and Roffe, supra, at 74; see also Parker Land and Cattle Co, 796 F. Supp. at 481-92 (describing 1988 brucellosis outbreak on the Parker ranch).

The USDA's revocation of Wyoming's brucellosis-free status would negatively impact the State's cattle industry by significantly (1) increasing costs to the State and its producers, and (2) limiting access to interstate and international markets. See Support for the Greater Yellowstone Interagency Brucellosis Committee, Western Governor's Ass'n. Res. 00-027 (June 13, 2000); see also Fund for Animals, Inc., v. Lujan, 962 F.2d 1391, 1401-02 (9th Cir. 1992) (loss of Montana's brucellosis-free status would require the State to spend over $2 million dollars per year testing cattle). Although Wyoming, for now, maintains its brucellosis-free certification, the continuing threat that the State's domestic cattle might contract the disease from free-ranging infected elk prompted several States in 1997 to threaten to restrict entry of Wyoming cattle into their borders.

In November 1997, the Governor of Wyoming wrote the Director of the FWS to request "immediate assistance and response to deal with our mutual concern with the

brucellosis issue in the State of Wyoming." The Governor explained that to appease concerned States, Wyoming obtained a "station review" from the USDA's Animal Plant Health Inspection Service (APHIS).[5] Among other things, APHIS dictated greater testing and control of Wyoming cattle at significant cost to the State. Meanwhile, according to the Governor, the FWS had proposed "an elaborate multi-year [vaccine] efficacy research study" to address the brucellosis problem on the NER. The Governor did "not support such a strategy, that under the guise of research, will defend the status quo for the next few years." Wyoming's Governor endorsed the vaccination of elk on the NER using Strain 19: "Our problem with brucellosis is now. We cannot wait for tomorrow's solutions, especially when we believe the Strain 19 vaccine to be effective based on experiences in vaccinating elk on state feed grounds."[6] Aplt's App. at 27-30.

---

[5] As the Governor explained in his letter to the Director of the FWS:

An APHIS station review has historically been used to audit a state's protocol for animal health issues and to make recommendations for any issues not being properly controlled, including any actions needed to implement safeguards to prevent the spread of the disease or a pest. Wyoming's request for the station review was designed as a compromise to quiet concerns over livestock marketed in other states. Without the station review, other states made it clear that they would place further sanctions on Wyoming . . . .

Aplt's App. at 28.

[6] With the approval of the FWS and in cooperation with the NER, the Wyoming Game and Fish Department (WGFD) in 1989 began vaccinating elk on a trial basis on the NER with Strain 19 delivered via biobullets. The WGFD continued to vaccinate elk

(continued...)

When the FWS failed to respond, the Governor delivered a second letter to the

Director of the FWS in January 1998 offering to undertake a vaccination program of elk

on the NER at the State's own expense, and to "indemnify and hold harmless" the FWS

from any claims arising out of the program. This time the Director responded, denying

the State of Wyoming the authority to conduct a Strain 19 vaccination program on

the NER:

> As you know, the Service disagrees that Wyoming has adequately demonstrated the effectiveness of the Strain 19 program. While we have no doubt that Wyoming has been successful at vaccinating elk [on state feed grounds], there are not adequate data to indicate whether or not the lowered seroprevalence is attributable to vaccination. Feed-line management on the Refuge, which minimizes the time that animals are concentrated on the feed line through the use of alfalfa pellets rather than hay also appears to have lowered seroprevalence according to Service data. However, in both cases (Wyoming vaccination and Refuge feed-line management), there are inadequate data to ensure that these particular management actions are solely responsible for or simply correlate with observed changes in seroprevalence. In the case of the State's feed grounds, the Service would be far less skeptical of the vaccine's effect if rigorous clinical trials had demonstrated efficacy under controlled conditions. . . .
>
> The Service is willing to implement a vaccination program once adequate, scientifically sound data demonstrate that any proposed vaccine is both safe and effective. We believe such a vaccine does not exist at this time, but we continue to support its development. . . .
>
> Therefore, given the points raised in this letter outlining the Service's

---

[6](...continued)
on the NER with Strain 19 for three years. "By May 1991, sufficient restrictions had been imposed on vaccination activities by the [FWS] that the [WGFD] felt that at the low level of cooperation, it was no longer cost effective or beneficial to continue to attempt to vaccinate elk [on the NER]." Aplt's App. at 188.

concerns for vaccination of elk with Strain 19, the Service does not authorize Wyoming to conduct a vaccination program on the Refuge at this time. . . .

Aplt's App. at 35-36.

## II.

Based upon the foregoing exchange with the FWS, the State of Wyoming filed suit for declaratory relief in federal district court, ostensibly under 28 U.S.C. § 2201, against Defendants, the United States and Secretary of the USDI (hereinafter collectively referred to as the "FWS"). The suit generally alleged the FWS's interference with the State's "sovereign right" to manage wildlife within its borders, including its right to vaccinate elk on the NER.[7] The district court, in a thorough opinion, dismissed the State's first amended complaint on its face pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) respectively for want of jurisdiction and failure to state a claim. Wyoming v. United States, 61 F. Supp. 2d 1209 (D. Wyo. 1999). The State appeals. Our jurisdiction arises under 28 U.S.C. § 1291. We review the dismissal of a complaint

---

[7] We are mindful that "[a]ll pleadings shall be so construed as to do substantial justice." Fed. R. Civ. P. 8(f). Nevertheless, we, like the district court, express frustration over the convoluted nature of the State's twenty-six page first amended complaint. The amended complaint, which runs afoul of Fed. R. Civ. P. 8(a), contains excessive legal argument and conclusions interspersed with factual allegations, jurisdictional claims, and citations to authority. Apparently, the State's original complaint was no clearer because the district court sua sponte granted the State leave to amend "in order to clarify the scope of the claims and jurisdictional bases contained therein." Wyoming, 61 F. Supp. 2d at 1213. The court commented: "Although the amended complaint far surpasses the original complaint in length, it has not substantially assisted the court in clarifying [the State's] position." Id. at 1213 n.1.

11

on its face under Rule 12(b)(1) or 12(b)(6) de novo, applying the same standard as the district court. We accept the complaint's factual allegations as true and ask whether the complaint, standing alone, is legally sufficient to state a claim for relief. E.W.F. v. St. Stephen's Indian High Sch., 264 F.3d 1297, 1303, 1305 (10th Cir. 001). Applying this standard, we affirm in part and reverse in part.

A.

In its first amended complaint, the State set forth three theories of relief against the FWS. See Aplt's App. at 698-723. In Count I, entitled "Impingement on State Sovereignty," the State alleged the FWS acted "ultra vires" or "in excess of [its] authority" or management powers under the NWRSIA by refusing to permit the State to vaccinate elk on the NER with Strain 19. Because the FWS had purportedly acted beyond its authority, the State claimed that the court was not bound by the review provisions of the Administrative Procedures Act (APA), 5 U.S.C. §§ 701-06. Rather, the State alleged the district court had "original jurisdiction to decide the ultra vires action of [the FWS]." As the jurisdictional basis for Count I, the State alleged federal question jurisdiction under 28 U.S.C. § 1331.

As the jurisdictional basis for Count II of its first amended complaint, the State again alleged federal question jurisdiction. In Count II, entitled "Tenth Amendment Infringement," the State alleged "inherent sovereign authority [within its borders] to manage, control, and regulate diseases in wildlife and domestic animals for the health,

12

safety and protection of its citizens, its domesticated livestock and its free roaming wildlife." The State further alleged that the FWS's decision impeded the interstate movement of its domestic cattle "without special restrictions placed on the State due to fear of disease transmission from infected wildlife from the National Elk Refuge."

In Count III, entitled "Review of Agency Action," the State sought "in the alternative . . . if no other jurisdictional basis exists," APA review of the FWS's refusal to permit the State to vaccinate elk on the NER. See 5 U.S.C. § 702. Substantively, Count III is similar to Count I. The State requested the district court to set aside the FWS's decision as "not in accordance with law," (i.e., beyond the FWS's management powers) and "in excess of statutory jurisdiction, authority, or limitations." See id. § 706(2)(A) & (C).

B.

The district court dismissed Counts I and II of the State's first amended complaint as jurisdictionally barred by federal sovereign immunity. See Fed. R. Civ. P. 12(b)(1). The court reasoned that neither the Constitution nor the NWRSIA contained a waiver of the Federal Government's sovereign immunity. Further, the court explained that the presence of federal questions in the State's complaint did not in itself constitute the necessary waiver of immunity. Absent federal legislation waiving immunity, the district court concluded the State of Wyoming could not obtain declaratory relief against the United States or the Secretary of the USDI. Wyoming, 61 F. Supp. 2d at 1214-16.

13

In addition to dismissing Count II for lack of jurisdiction, the district court dismissed Count II on the merits as well. See Fed. R. Civ. P. 12(b)(6). According to the court, managing wildlife on federal land was not a power reserved to the States under the Tenth Amendment. Rather, the Federal Government took that power under the auspices of the Constitution's Property Clause, and relied on it to enact the NWRSIA. Accordingly, the court held that the State of Wyoming "does not have the sovereign power to manage wildlife on Federal lands." Wyoming, 61 F. Supp. 2d at 1216-17.

The district court also dismissed Count III of the State's first amended complaint. The district court reasoned that the APA did not provide an independent jurisdictional basis for review of agency action. While the court recognized that the APA allowed review of agency action in excess of statutory authority, the court construed the NWRSIA as granting the FWS unlimited discretion to manage wildlife on federal land, thus providing no basis on which to review the FWS's decision. The court stated that in enacting the NWRSIA, "Congress undoubtedly envisioned a nationwide, cohesively administered network of lands and waters where wildlife would be managed and conserved under the direction of the Secretary. There is no indication in [the NWRSIA] that Congress intended to curtail the Secretary's power or leave any residual power to the States." The court concluded that the "broad language" of the NWRSIA gave "the Secretary complete administrative and management authority over [the NER]." To allow the State of Wyoming "to dictate policies and activities on a federal refuge,

14

where Congress has already crafted a system for its administration by the Secretary, would be at odds with the vast majority of the Refuge Act's other provisions." Wyoming 61 F. Supp. 2d at 1218-20.

In dismissing Count III, the district court rejected the State's interpretation of the NWRSIA. Considering the NWRSIA in its entirety, the court construed the NWRSIA as reflecting only "a Congressional intent for States to retain their role as primary managers of hunting and fishing of resident wildlife within their borders as consistent with federal law." According to the district court, the NWRSIA did not provide the State with either the exclusive or concurrent right to manage wildlife on the NER. Because the State had no available remedy, Count III of the first amended complaint failed to state a claim upon which relief could be granted. Wyoming, 61 F. Supp. 2d at 1220-23.[8]

---

[8] In concluding its opinion, the district court expressed frustration with the outcome:

> Thus, Congressional timidity has legislated another Federal-State standoff. The intransigence of the Secretary trumps the well-intentioned efforts of the State to solve the brucellosis problem in elk. Only the poor, dumb creatures of the wild suffer as this disease spreads while the FWS dithers over whether Wyoming's vaccination program has imperfections. That Wyoming's program may not be perfect is not a sine qua non, but it at least is moving forward to do something about a serious, spreading wildlife disease. The Court is sorry that this patchwork of federal law gives the Secretary room to play out her stalling game while doing nothing.

Wyoming, 61 F. Supp. 2d at 1222-23.

III.

On appeal, the State of Wyoming challenges every aspect of the district court's order dismissing its first amended complaint. The State asserts a concurrent, if not exclusive, right to manage wildlife on the NER, including a right to vaccinate elk on the NER with Strain 19, free from federal interference. The FWS counters by asserting exclusive unlimited discretion under the NWRSIA to manage wildlife on the NER in any manner the Secretary deems appropriate, free from state interference. Unfortunately, we do not believe this case is as clear cut and easily resolved as the parties urge.

A.

Count II of the first amended complaint raises the State of Wyoming's sole constitutional challenge to the FWS's refusal to permit the State to vaccinate elk on the NER. The State bases its challenge upon an alleged reservation of rights under the Tenth Amendment, which provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, . . . ." According to the State, the Tenth Amendment reserves to the State the right to manage wildlife on the NER to protect its own wildlife and domestic livestock; and properly construed, the NWRSIA preserves that right. The district court rejected the State's view and held the doctrine of sovereign immunity barred Count II. We address Count II of the first amended complaint prior to Count I to answer the threshold question of whether the Constitution delegates to the United

16

States the power to place management of wildlife on federal lands outside the State of Wyoming's hands.

1.

In dismissing Counts I and II for lack of jurisdiction, the district court properly recognized that the defense of sovereign immunity is jurisdictional in nature. United States v. Mitchell, 463 U.S. 206, 212 (1983). Sovereign immunity generally shields the United States, its agencies, and officers acting in their official capacity from suit. Federal Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 475 (1994). A State, like any other entity, generally cannot pursue a suit against the Federal Government absent a congressional waiver of immunity. Block v. North Dakota, 461 U.S. 273, 280 (1983). General jurisdictional statutes such as 28 U.S.C. § 1331 do not waive the Government's sovereign immunity. Lonsdale v. United States, 919 F.2d 1440, 1443-44 (10th Cir. 1990). Nor does the declaratory judgment statute, 28 U.S.C. § 2201, itself confer jurisdiction on a federal court where none otherwise exists. New Mexico v. Regan, 745 F.2d 1318, 1323 (10th Cir. 1984).

Federal courts generally deem a suit for specific relief, e.g., injunctive or declaratory relief, against a named officer of the United States to be a suit against the sovereign. Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 687-88 (1949).

> For the sovereign can act only through agents and, when an agent's actions are restrained, the sovereign itself may, through him, be restrained. . . . In

17

each such case the compulsion which the court is asked to impose, may be compulsion against the sovereign, although nominally directed against the individual officer. If it is, then the suit is barred not because it is a suit against an officer of the Government, but because it is, in substance, a suit against the Government over which the court, in the absence of consent, has no jurisdiction.

Id. at 688. Two narrow exceptions to the general bar against suits seeking specific relief from the United States exist. A court may regard a government officer's conduct as so "illegal" as to permit a suit for specific relief against the officer as an individual if (1) the conduct is not within the officer's statutory powers or, (2) those powers, or their exercise in the particular case, are unconstitutional. Id. at 702. Absent these exceptions, sovereign immunity would unjustifiably protect the Government in the exercise of powers it does not possess.[9]

Undeniably, the State's first amended complaint seeks to compel Defendant United States, though Defendant Secretary of the USDI (and through the FWS), to permit the State to vaccinate elk on the NER with Strain 19. In substance then, Count II is not against the Secretary individually, but against the United States itself. See Regan,

_____

[9] In Larson, 337 U.S. at 691 n.11, the Court explained that despite these exceptions, a suit may still fail as one against the sovereign "if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property." See United Tribe of Shawnee Indians v. United States, 253 F.3d 543, 546-48 (10th Cir. 2001) (relying on Larson to conclude that because the relief sought would require affirmative action by federal officials, the "ultra vires doctrine" did not provide a waiver of the Government's sovereign immunity). Because in this case we ultimately reject the State's Tenth Amendment claim, we need not concern ourselves with Larson's "exception to the exceptions."

18

745 F.2d at 1321 ("[S]overeign immunity is determined not by the party named as the defendant, but by the issues presented and the effect of the judgment."). Even so, the State suggests a "claim that a federal official violated a federal statute reserving the States' authority to manage wildlife is a claim upon which relief can be granted under the Tenth Amendment's guarantee of powers reserved to the States."

We determine whether the Tenth Amendment reserves a power to the States, not by reference to a federal statute as the State seems to suggest, but by reference to the Constitution. As best we can discern, the State of Wyoming essentially argues that the FWS, in refusing to permit the State to vaccinate elk on the NER to protect its own wildlife and domestic livestock, acted outside its "statutory powers" under the NWRSIA, as constrained by the Tenth Amendment. According to the State, the district court had jurisdiction over Count II of the first amended complaint precisely because the Tenth Amendment reserves to the State the right, whether exclusive or concurrent, to manage wildlife on the NER free from federal interference under these circumstances; and the NWRSIA must be so construed. The Tenth Amendment, however, does not require us to construe the NWRSIA in any particular manner. A review of the State's Tenth Amendment claim reveals that the claim is meritless and the district did in fact lack jurisdiction over Count II. See Larson, 337 U.S. at 690 (recognizing that "the jurisdiction of the court to hear the case may depend . . . upon the decision which it ultimately reaches on the merits").

19

We may view the State of Wyoming's Tenth Amendment challenge to the FWS's position in either of two ways. New York v. United States, 505 U.S. 144 (1992). If the Constitution delegates to Congress the power to exercise management authority over federal land, including the wildlife thereon, "the Tenth Amendment expressly disclaims any reservation of that power to the States." Id. at 156. On the other hand, if the power to manage federal land within a State, including the wildlife thereon, "is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." Id. "'The question is not what power the Federal Government ought to have but what powers in fact have been given by the people.'" Id. at 157 (quoting United States v. Butler, 297 U.S. 1, 63 (1936)); see also Kelley v. United States, 69 F.3d 1503, 1509 (10th Cir. 1995).

Historically, States have possessed "broad trustee and police powers over the . . . wildlife within their borders, including . . . wildlife found on Federal lands within a State." 43 C.F.R. § 24.3 (policy statement of the USDI); see also Kleppe v. New Mexico, 426 U.S. 529, 545 (1976). But those powers are not constitutionally-based. The Property Clause of the United States Constitution delegates to Congress (thus the Tenth Amendment does not reserve to the States) "the Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. Of course, the Property Clause alone does

not withdraw federal land within a State from the jurisdiction of the State.  See California Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 580 (1987) ("The Property Clause itself does not automatically conflict with all state regulation of federal land.").  "[F]or many purposes a State has civil and criminal jurisdiction over lands within its limits belonging to the United States . . . ."  Utah Power & Light Co. v. United States, 243 U.S. 389, 404 (1917).  The Property Clause simply empowers Congress to exercise jurisdiction over federal land within a State if Congress so chooses.  See Kleppe, 426 U.S. at 543-45.

Notably, Congress' power in this regard is "plenary."  Granite Rock, 480 U.S. at 81.  State jurisdiction over federal land "does not extend to any matter that is not consistent with full power in the United States to protect its lands, to control their use and to prescribe in what manner others may acquire rights in them."  Utah Power, 243 U.S. at 404.  If Congress so chooses, federal legislation, together with the policies and objectives encompassed therein, necessarily override and preempt conflicting state laws, policies, and objectives under the Constitution's Supremacy Clause, U.S. Const. art. VI, cl. 2.  See Kleppe, 426 U.S. at 543 ("'A different rule would place the public domain of the United States completely at the mercy of [the State]'" (quoting Camfield v. United States, 167 U.S. 518, 526 (1897)).

In Kleppe, the State of New Mexico challenged the Federal Government's power under the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331-1340, to control wild horses and burros on federal land unless the animals were moving in

21

interstate commerce, damaging federal land, or endangered. Kleppe, 426 U.S. at 537, 541 n.10. The Court rejected the State's "narrow reading of the Property Clause." Id. at 537. Upholding the Act, the Court explained that "while the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, we have repeatedly observed that the power over public land thus entrusted to Congress is without limitations." Id. at 529 (internal brackets and quotations omitted); accord Granite Rock, 480 U.S. at 580; see also Branson Sch. Dist. Re-82 v. Romer, 161 F.3d 619, 636 (10th Cir. 1998) (noting that the "Supreme Court . . . has recognized the very broad powers of Congress under the Property Clause to use and dispose of federal property as Congress sees fit").

> Although the Property Clause does not authorize an exercise of a general control over public policy in a State, it does permit an exercise of the complete power which Congress has over particular public property entrusted to it. In our view, the "complete power" that Congress has over public lands necessarily includes the power to regulate and protect the wildlife living there.

Kleppe, 426 U.S. at 540-41 (emphasis added).

In view of the foregoing, we believe the point painfully apparent that the Tenth Amendment does not reserve to the State of Wyoming the right to manage wildlife, or more specifically vaccinate elk, on the NER, regardless of the circumstances. Therefore, the district court properly concluded that the doctrine of sovereign immunity barred Count II of the State's first amended complaint. The remedy the State seeks must come, if at all, not from the Constitution but from Congress. To what extent Congress sought to

exercise its power under the Property Clause in enacting the NWRSIA is the inquiry to which we turn next.

## B.

As in Count II, the State of Wyoming in Count I of its first amended complaint alleges that the FWS acted beyond its authority or "ultra vires" in refusing to permit the State to vaccinate elk on the NER with Strain 19. Unlike Count II's constitutionally-based challenge, however, the State bases Count I directly upon its construction of the NWRSIA. According to the State, the NWRSIA reserves to the State the unencumbered right to manage wildlife on the NER. To sustain Count I, the State again alleged the original jurisdiction of the district court under 28 U.S.C. § 1331, this time to decide whether the FWS had exceeded its statutory authority under the NWRSIA in denying the State's request. Like Count II, the district court dismissed Count I on the basis of sovereign immunity.

## 1.

The mission of the NWRS "is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2).[10] The NWRSIA directs

---

[10] Because "dual administration" of the NWRS among the FWS and other federal agencies proved "unworkable," see S. Rep. No. 94-593, reprinted in 1976 U.S.C.C.A.N.

(continued...)

23

the FWS to, among other things, "ensure that the biological integrity, diversity, and environmental health of the System are maintained." 16 U.S.C. § 668dd(a)(4)(B). The NWRSIA authorizes the FWS, "under such regulations as [the Secretary] may prescribe, to permit the use of any area within the System for any purpose . . . whenever [the Secretary] determines that such uses are compatible with the major purposes for which such areas were established." Id. § 668dd(d)(1)(A). The Act defines the phrase "compatible use" as "a wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of the Director [of the FWS], will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." Id. § 668ee(1).

While plainly vesting the FWS with authority to administer the Act and manage the NWRS,[11] the NWRSIA makes numerous mention of the need for cooperation between the FWS and the States to achieve the Act's objectives. At its outset, the NWRSIA directs that the FWS "shall" (1) "complement efforts of States and other Federal agencies to conserve fish and wildlife and their habitats;" (2) "ensure effective

_____

[10](...continued)
288-95, Congress amended the NWRSAA in 1976 to assign the sole responsibility of administering the NWRS, including the NER, to the Secretary of the USDI "through the United States Fish and Wildlife Service." Pub. L. No. 94-223, 90 Stat. 199 (1976) (codified at 16 U.S.C. § 668dd(a)(1)).

[11] The NWRSIA does not define the term "administer." In its common usage, "administer" means to "manage," which in turn means to "direct govern or control in action or use." Random House Dictionary 26, 1166 (2d. ed. 1987). Manage is a lesser included term of administer.

coordination, interaction, and cooperation with owners of land adjoining refuges and the fish and wildlife agency of the States in which the units of the System are located;" and (3) "ensure timely and effective cooperation and collaboration with Federal agencies and State fish and wildlife agencies during the course of acquiring and managing refuges."  Id. § 668dd(a)(4)(C), (E), (M).[12]

To that end, the NWRSIA directs the FWS to "issue a final conservation plan" for each refuge "consistent with the provisions of this Act and, to the extent practicable, consistent with the fish and wildlife conservation plans of the State in which the refuge is located."  Id. at § 668dd(e)(1)(A)(iii).  In preparing and periodically revising the plan, the FWS "shall, to the maximum extent practicable and consistent with this Act— (A) consult with adjoining Federal, State, local, and private landowners and affected State

---

[12]  In the USDI's "Fish and Wildlife Policy: State-Federal Relationships," 43 C.F.R. Part 24, the Secretary similarly recognizes that given the existing jurisdictional relationship between the States and Federal Government, "the effective stewardship of fish and wildlife" requires cooperation between the two. Id. § 24.1(b).  The purpose of the Secretary's policy is "to reaffirm the basic role of the States in fish and resident wildlife management . . . ."  Id. § 24.2(a).

> In developing and implementing this policy, this Department will be furthering the manifest Congressional policy of Federal-State cooperation that pervades statutory enactments in the area of fish and wildlife conservation.  Moreover, in recognition of the scope of its activities in managing hundreds of millions of acres of land within the several States, the Department of the Interior will continue to seek new opportunities to foster a "good neighbor" policy with the States.

Id. § 24.2(b).

conservation agencies; and (B) coordinate the development of the conservation plan or revision with relevant State conservation plans for fish and wildlife and their habitats." Id. § 668dd(e)(3).

Notably for purposes of this case, the NWRSIA concludes with an opaque provision termed "State authority:"

> Nothing in this Act shall be construed as affecting the authority, jurisdiction, or responsibility of the several States to manage, control, or regulate fish and resident wildlife under State law or regulations in any area within the System. Regulations permitting hunting or fishing of fish and resident wildlife within the System shall be, to the extent practicable, consistent with State fish and wildlife laws, regulations, and management plans.

Id. § 668dd(m). The State of Wyoming primarily relies on the first sentence of this "saving clause" to support its claimed right to vaccinate elk on the NER with the Strain 19 brucellosis vaccine. According to the State, Congress specifically included the saving clause in the NWRSIA to "reserve[] to the States the right to manage wildlife on refuge lands within their borders." Consequently, the State opines the FWS exceeded its authority under the NWRSIA when it refused to permit the State to vaccinate elk on the NER.

2.

As explained, the Supreme Court in Larson recognized an exception to the sovereign immunity doctrine in a suit for specific relief against the United States where a government official acted ultra vires or beyond those powers Congress extended.

26

Larson, 337 U.S. at 689[13]; see also Louisiana Public Serv. Comm'n v. Federal Communications Comm'n, 476 U.S. 355, 374-75 (1986) ("An agency may not confer power upon itself. To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress."). The Court emphasized, however, that application of the ultra vires exception to the sovereign immunity doctrine rested upon "the officer's lack of delegated power," or, more specifically in this case, lack of statutory authority. Larson, 337 U.S. at 690; see also Regan, 45 F.2d at 1320 n.1 (noting that the Supreme Court has rejected ultra vires arguments "asserted in the attempt to avoid the shield of sovereign immunity").

Therefore, an official's erroneous exercise of delegated power is insufficient to invoke the exception. Larson, 337 U.S. at 690; accord Painter v. Shalala, 97 F.3d 1351, 1358 (10th Cir. 1996). Official action is not ultra vires or invalid "if based on an incorrect decision as to law or fact, if the officer making the decision was empowered to do so." Larson, 337 U.S. at 695. Moreover, the mere allegation that an officer acted wrongfully does not establish that the officer, in committing the alleged wrong, was not exercising the powers delegated to him by the sovereign. United Tribe of Shawnee Indians v. United States, 253 F.3d 543, 548 (10th Cir. 2001). If the officer is exercising

---

[13] Because we ultimately conclude that the FWS's denial of the State's request to vaccinate elk on the NER was not ultra vires, we again need not address the possible application of "Larson's 'exception to the exceptions.'" See supra, n.9.

such powers, the suit is in fact against the sovereign and may not proceed unless the sovereign has consented.  Id.  Thus, the question of whether a government official acted ultra vires is quite different from the question of whether that same official acted erroneously or incorrectly as a matter of law.

In Count I of its first amended complaint, the State of Wyoming does not seek "review" of the FWS decision to deny the State's request to vaccinate elk on the NER.  Such review is available, if at all, through the APA.  Instead, the State seeks to strike down a decision of the FWS (made on behalf of Defendants Secretary of the USDI and the United States), allegedly in excess of the powers Congress delegated to the agency in the NWRSIA.  See Leedom v. Kyne, 358 U.S. 184, 188 (1959).  Whether the FWS's decision in this case was ultra vires as the State claims in Count I turns solely upon our legal construction of the NWRSIA and, in particular, its saving clause.  We conclude the FWS's decision to deny the State's request to vaccinate elk on the NER was not ultra vires.

3.

The intent of Congress in enacting the NWRSIA is the focus of our inquiry under Count I.  The question whether federal law authorized certain federal agency action is one of congressional intent.  "The purpose of Congress is the ultimate touchstone."  Gade v. National Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 96 (1992) (internal quotations and brackets omitted).  Unfortunately, ascertaining the intent of

28

Congress in disputes between the Federal Government and a State is among the most difficult judicial tasks.  We remain mindful, however, that Congress may accommodate state interests through legislative action short of its constitutionally empowered reach. As we have seen, under the Property Clause Congress could choose (1) to assume all management authority over the NWRS, including the NER, (2) to share management authority over those federal lands with the States, or (3) to preserve to its fullest extent the States' historical role in the management of wildlife within their respective borders.

To construe the NWRSIA, we examine "the purpose, structure, and legislative history of the entire statute."  California v. Federal Energy Regulatory Comm'n, 495 U.S. 490, 504 (1990) (hereinafter FERC).  "We must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law."  Gade, 505 U.S. at 99 (internal quotations and brackets omitted).  Our task, broadly defined, is to discern to what extent Congress in enacting the NWRSIA intended to preempt the States' wildlife management jurisdiction over federal lands.  See generally G. Coggins & M. Ward, The Law of Wildlife Management on Federal Public Lands, 60 Or. L. Rev. 59, 75-85 (1981) (discussing wildlife management authority and jurisdiction over federal public lands).

Initially, we note that this is not a case in which the State of Wyoming seeks to invade "an area where the federal interest has been manifest since the beginning of our Republic."  Compare United States v. Locke, 529 U.S. 89, 99 (2000) (recognizing the

long-standing federal interest in the regulation of maritime commerce). Rather, as the Secretary of the USDI recognizes, wildlife management is a field which the States have traditionally occupied. Even today, the Secretary generally acknowledges that "State jurisdiction remains concurrent with Federal authority." 43 C.F.R. § 24.3(c); see also id. § 24.3(b) ("[D]espite the existence of constitutional power respecting fish and wildlife on Federally owned lands, Congress has, in fact, reaffirmed the basic responsibility and authority of the States to manage fish and resident wildlife on Federal lands."). According to the Secretary, "Federal authority exists for specified purposes while State authority regarding fish and resident wildlife remains the comprehensive backdrop applicable in the absence of specific, overriding Federal law." Id. § 24.1(a); see also Locke, 529 U.S. at 109 ("It is fundamental in our federal structure that States have vast residual powers. Those powers, unless constrained or displaced by the existence of federal authority or by proper federal enactments, are often exercised in concurrence with those of the National Government.").

In light of the foregoing, our assumption is that the NWRSIA was not to supercede the State of Wyoming's historical police powers to manage wildlife on federal lands within its borders "unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947). "Just as courts may not find state measures pre-empted in the absence of clear evidence that Congress so intended, so must they give full effect to evidence that Congress considered, and sought to preserve,

30

the States' coordinate regulatory role in our federal scheme." FERC, 495 U.S. at 497.

The first sentence of the NWRSIA's saving clause, viewed in isolation, seems to support our assumption that even after the NWRSIA, the State retains the absolute right to manage wildlife on the NER free from federal intervention: "Nothing in this Act shall be construed as affecting the authority, jurisdiction, or responsibility of the several States to manage, control, or regulate fish and wildlife under State law or regulations in any area within the System." 16 U.S.C. § 668dd(m) (emphasis added). The State's sweeping interpretation of the first sentence in § 668dd(m) is not without force, and our assumption might be plausible if we interpreted the sentence in isolation. Such an interpretation of the saving clause, however, simply is not feasible in light of established rules of construction requiring us to consider the NWRSIA in its entirety, mindful of congressional purposes and objectives. But see Defenders of Wildlife v. Andrus, 627 F.2d 1238, 1248 (D.C. Cir. 1980) (suggesting without analysis in dicta that the first sentence of § 668dd(m) reserves the authority to manage wildlife on federal lands to the States).

Unquestionably, the NWRSIA inspirits a "cooperative federalism," calling for, at a minimum, state involvement and participation in the management of the NWRS as that system affects surrounding state ecosystems. See California v. United States,

438 U.S. 645, 650 (1978).[14]  Consistent with the NWRSIA, the Secretary of the USDI

in her policy statement, "reaffirm[s] the basic role of the States in . . . resident wildlife

management," and the need for a "'good neighbor' policy" between the Federal

Government and the States for the benefit of the general ecosystem.  43 C.F.R. § 24.2.

As we have seen, the NWRSIA specifically directs the Secretary in managing the

NWRS (through the FWS) to cooperate with both the States and adjoining landowners.

E.g., 16 U.S.C. § 668dd(a)(4)(C), (E), (M).

Still, the NWRSIA requires the FWS in developing conservation plans for a

refuge to act in conformity with State objectives only "to the extent practical."  Id.

§ 668dd(e)(1)(A)(iii); id. § 668dd(e)(3).[15]  The NWRSIA's legislative history confirms

---

[14]  In California v. United States, the Court held that the State could place
conditions on its allocation of water to a federal reclamation project so long as those
conditions were not inconsistent with clear congressional directives regarding the project.
To reach its decision, the Court relied on the saving clause of the Federal Reclamation
Act of 1902 (FRA), 43 U.S.C. § 383.  Unlike the NWRSIA's saving clause, the FRA's
saving clause expressly directs the Secretary of the USDI to follow state law in
implementing the provisions of the FRA:

> Nothing in this Act shall be construed as affecting or intended to affect or
> to in any way interfere with the laws of any State or Territory relating to the
> control, appropriation, use, or distribution of water used in irrigation, . . .
> and the Secretary of the Interior, in carrying out the provisions of this Act,
> shall proceed in conformity with such laws, . . . .

(emphasis added).  See California, 438 U.S. at 650 ("If the term 'cooperative federalism'
had been in vogue in 1902, the Reclamation Act . . . would surely have qualified as a
leading example of it.").

[15]  The NWRSIA directs the Secretary in preparing a conservation plan to

(continued...)

32

this, stating the Act requires that "to the extent practicable, the FWS should seek opportunities to coordinate the management of National Wildlife Refuges with the management of fish and wildlife resources generally by the State or States in which the refuges are located." H.R. Rep. No.105-106, at 8, reprinted in 1997 U.S.C.C.A.N. 1798-12 to 1798-13. Even the second and final sentence of the NWRSIA's saving clause, which appears to contradict its first sentence, requires only that "[r]egulations permitting hunting or fishing of fish and resident wildlife within the system shall be, to the extent practicable, consistent with State fish and wildlife laws, regulations, and management plans." 16 U.S.C. § 668dd(m); compare FERC 495 U.S. at 498-507.[16]

---

[15](...continued)
"[a]t a minimum . . . require that publication of any final plan shall include a summary of the comments made by States, owners of adjacent or potentially affected land, local governments, and any other affected persons, and a statement of the disposition of concerns expressed in those comments." Id. § 668dd(e)(4)(A).

[16] The Court in FERC rejected the State's construction of the Federal Power Act's (FPA) saving clause, 16 U.S.C. § 821. That section reads

Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein.

Relying on its prior construction of the same clause in First Iowa Hydro-Elec. Coop. v. Federal Power Comm'n, 328 U.S. 152 (1946), the Court in FERC held that the FPA preempted the State's minimum water flow rate requirements designed to protect stream fish.

By directing FERC to consider the recommendations of state wildlife

(continued...)

The legislative history behind § 668dd(m) lends little support to the State of

Wyoming's claim that the saving clause unconditionally reserves to it the "sovereign"

right to manage elk on the NER.

> Your committee has added a provision to this subsection which makes it clear that this bill does not diminish or increase the authority, jurisdiction, or responsibility of the States relative to fish and resident wildlife in any area within the system. The amendment was agreed to by the President of the International Association of Game, Fish, and Conservation Commissioners representing all the State fish and game departments and by the Department of the Interior. It is designed to maintain the status quo relative to the dispute between the States and the Department over the issue of which entity has the authority to control, manage, and regulate fish and resident wildlife on areas within the System. The Department's position is set forth in the Solicitor's 1964 opinion which is printed in the Senate hearing on S. 2217. The State's position is set forth in their brief which is on file in the offices of this committee and available for public review. Both parties have agreed that this language does not change either the States' or the Solicitor's position. It maintains the status quo and will permit the parties to negotiate and resolve the problem at a future date.

S. Rep. No. 1463, at 6-7, reprinted in 1966 U.S.C.C.A.N. at 3347-3348. The discussion

---

[16](...continued)
and other regulatory agencies while providing FERC with final authority to establish license conditions (including those inconsistent with the States' recommendations), Congress has amended the FPA to elaborate and reaffirm First Iowa's understanding that the FPA establishes a broad and paramount federal regulatory role. See 16 U.S.C. § 803(a)(1)-(3) (FERC to issue license on conditions that protect fish and wildlife, after considering recommendations of state agencies), as amended by . . . 16 U.S.C. § 803(j)(1)-(2) (FERC license conditions protecting fish and wildlife to be based on recommendations of federal and state wildlife agencies, with FERC to issue findings if it adopts conditions contrary to recommendations).

FERC, 495 U.S. at 499-500.

of the saving clause in the Senate Report together with the entire tone of the NWRSIA

reveals that Congress was solicitous of state sensibilities and simply did not wish to face

the Federal-State jurisdictional dilemma which the NWRSIA and its predecessor the

NWRSAA created.  Instead, Congress left the courts to resolve jurisdictional disputes

on a case-by-case basis.  As two commentators put it:  "The main legislative theory seems

to be on the order of 'let's just muddle through as best we can and let the courts handle

the hard cases.'"  Coggins & Ward, supra, at 84-85 (noting that "[i]n the end, this

jurisdictional imbroglio is more political than legal"); see also United States v.

Vesterso, 828 F.2d 1234, 1240-41 & n.5 (8th Cir. 1987).[17]

In the end, the proposition that the FWS lacks the power to make a decision

regarding the health of wildlife on the NER when a State, for whatever reason, disagrees

with that decision proves too much.  To be sure, Congress in enacting the NWRSIA

recognized that "National Wildlife Refuges are often important components of the

---

[17]  In Vesterso, the Eight Circuit interpreted § 668dd(j) of the NWRSIA (then § 668dd(i) of the NWRSAA), which provides:  "Nothing in this Act shall constitute an express or implied claim or denial on the part of the Federal Government as to exemption from State water laws."  Members of the county water board argued that § 668dd(j) intended to preserve continued and unaltered state regulation of water.  The court rejected such a broad interpretation.

> We believe the clear purpose of this provision was simply to prevent a general preemption of state water laws . . . .  In other words, the terms of the Wildlife Refuge Act were to be given their full effect, and any conflict with state law would be dealt with on a case-by-case basis.

Vesterso, 828 F.2d at 1240 (footnote omitted).

35

ecosystems in which they are located and contribute significantly to the conservation of those ecosystems. Nonetheless, they cannot fulfill the mission set forth in [the NWRSIA] unless they are consistently directed and managed as a national system." H.R. Rep. No. 105-106, at 8. By establishing a system "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration" of wildlife, 16 U.S.C. § 668dd(a)(2), Congress undoubtedly intended a preeminent federal role for the FWS in the care and management of the NWRS.

The first sentence of the saving clause does not deny the FWS, where at odds with the State, the authority to make a binding decision bearing upon the "biological integrity, diversity, and environmental health of the System." Id. § 668dd(a)(4)(B). Such a construction of the saving clause would be inconsistent with the NWRSIA's "mission . . . to administer a national network of lands." Id. § 668dd(a)(2). If we construed the NWRSIA to grant the State of Wyoming the sweeping power it claims, the State would be free to manage and regulate the NER in a manner the FWS deemed incompatible with the NER's purpose. But the Secretary alone is authorized, "under such regulations as he may prescribe," to "permit the use of any area within the System for any purpose . . . whenever he determines that such uses are compatible with the major purposes for which such areas were established . . . ." Id. § 668dd(d)(1)(A); see also id. § 668dd(d)(3)(A) (The Secretary shall not permit a use of a refuge "unless the Secretary has determined that the use is a compatible use.").

36

Yet, the NWRSIA's saving clause is not meaningless. Section 668dd(m) convinces us that Congress did not intend to displace entirely state regulation and management of wildlife on federal public lands, especially where such regulation and management bears directly upon the well being of state interests arising outside those public lands. In other words, Congress rejected complete preemption of state wildlife regulation within the NWRS. Rather, we believe Congress intended ordinary principles of conflict preemption to apply in cases such as this. That is to say federal management and regulation of federal wildlife refuges preempts state management and regulation of such refuges to the extent the two actually conflict, or where state management and regulation stand as an obstacle to the accomplishment of the full purposes and objectives of the Federal Government. See Granite Rock, 480 U.S. at 581.[18]

Accordingly, we cannot accept the State of Wyoming's broad and absolute challenge in Count I of its first amended complaint to the FWS's authority to manage wildlife on the NER in a manner with which the State disagrees, or, more specifically, to make a decision bearing upon the health of elk and other wildlife on the NER. Cf., S. Rep. No. 94-593, reprinted in 1976 U.S.C.C.A.N. 288-95 (noting that "dual

---

[18] In Granite Rock, the Court applied conflict preemption principles and held that federal statutes and regulations did not preempt the California Coastal Commission's imposition of a permit requirement on the operation of an unpatented mining claim in a national forest. The Court rejected Granite Rock's argument that federal land management statutes limited States to a purely advisory role in federal land management decisions, and that the Commission's permit requirements were an impermissible land use regulation. Granite Rock, 480 U.S. at 581-93.

37

administration of [refuges] has been unworkable"). The Supreme Court has "'repeatedly decline[d] to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.'" Geier v. American Honda Motor Co., 529 U.S. 861, 868 (2000) (brackets in original) (quoting Locke, 529 U.S. at 106). Today, we adhere to that established rule of law. We find highly unlikely the proposition that Congress would carefully craft the substantive provisions of the NWRSIA to grant authority to the FWS to manage the NER and promulgate regulations thereunder, see 50 C.F.R. Parts 25-35, and then essentially nullify those provisions and regulations with a single sentence. The recent words of the Supreme Court are appropriate here.

> Why, in any event, would Congress not have wanted ordinary pre-emption principles to apply where an actual conflict with a federal objective is at stake? Some such principle is needed. In its absence, state law could impose legal duties that would conflict directly with federal regulatory mandates . . . . To the extent that such an interpretation of the saving provision reads into a particular federal law toleration of a conflict that those principles would otherwise forbid, it permits that law to defeat its own objectives or potentially as the Court has put it before, to "destroy itself." We do not claim that Congress lacks the constitutional power to write a statute that mandates such a complex type of state/federal relationship. But there is no reason to believe Congress has done so here.

American Honda, 529 U.S. at 871-72 (internal quotations and citations omitted).[19]

---

[19] In American Honda, the Court held that federal law, which in 1984 required some but not all motor vehicles to be equipped with airbags, preempted a state common law tort action against a manufacturer in compliance with that federal law. Despite the presence of a saving provision that stated "'[c]ompliance with' a federal safety standard 'does not exempt any person from any liability under common law.' 15 U.S.C. § 1397(k)," the Court reasoned that the clause did not bar the working of ordinary

(continued...)

Consistent with our construction of the NWRSIA, we hold that the FWS's decision to refuse to permit the State to vaccinate elk on the NER with Strain 19 based upon efficacy and biosafety concerns was not, in itself, beyond the agency's statutory authority or ultra vires. Just as the authority of a court to decide a case does not disappear if its decision on the merits is wrong, the authority of a government agency to make a decision or resolve a conflict does not disappear simply because that decision or resolution might be erroneous. See Larson, 337 U.S. at 695. The district court properly dismissed Count I of the first amended complaint on the basis of sovereign immunity. Our conclusion that the FWS possessed the authority to make a decision regarding the vaccination of elk on the NER with Strain 19, however, does not answer the question of whether the FWS properly exercised that authority. That is the final inquiry to which we now turn.

C.

At the prompting of the district court, the State of Wyoming amended its original complaint and grudgingly added Count III to its first amended complaint seeking review of the FWS's decision under the APA, 5 U.S.C. §§ 701-706. The State sought to overturn the FWS's decision under both § 706(2)(A) as "not in accordance with law," and § 706(2)(C) as "in excess of statutory jurisdiction." The district court dismissed Count III, essentially holding that because the NWRSIA granted the FWS unlimited

[19](...continued)
conflict preemption principles. American Honda, 529 U.S. at 868-69.

39

discretion to manage wildlife on the NER, no legal basis existed under which to review

the agency's decision to deny the State's request.  Wyoming, 61 F. Supp. 2d at 1220-23.

In resolving Count I against the State, we have already concluded that the FWS

did not act in excess of its authority under the NWRSIA when it refused to accede to

the State's demand to vaccinate elk on the NER.[20]  We therefore focus on whether the

FWS's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law."  5 U.S.C. § 706(2)(A).  As a preliminary matter, we once

again examine the district court's jurisdiction to proceed.

1.

Section 702 of the APA provides that "[a] person suffering legal wrong because

of agency action, or adversely affected or aggrieved by agency action within the meaning

of a relevant statute, is entitled to judicial review thereof.  An action . . . seeking relief

other than money damages . . . shall not be dismissed . . . on the ground that it is against

the United States."  See also id. § 701(b)(2) (defining "person" to include governmental

entities").  Section 702 generally waives the sovereign immunity of the United States,

---

[20]  We also note that § 706(2)(B) provides for review of agency action "contrary
to constitutional right."  We, of course, decided that the FWS's decision was not contrary
to constitutional right in resolving Count II's Tenth Amendment claim against the State.
Because in resolving Counts I and II, we necessarily determined, as we would under APA
review, that the substantive basis for those counts was meritless, we need not address
the extent to which the APA might supercede the principles announced in Larson,
337 U.S. at 682.  See United States v. Murdock Mach. and Eng'g Co., 81 F.3d 922,
930 (10th Cir. 1996) (citing Larson as "superceded in part by 5 U.S.C. § 702").

its agencies, and officials in agency review actions seeking specific relief. Shawnee Indians, 253 F.3d at 549. The provisions of the APA are applicable "except to the extent that–(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).

The APA, however, is not an independent grant of jurisdiction to review agency action. Califano v. Sanders, 430 U.S. 99, 107 (1977). Instead we must look to the provisions of the NWRSIA to determine the district court's jurisdiction under Count III. In doing so, we remain mindful that "[j]udicial review of final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." Bowen v. Michigan Acad. of Family Physicians, 476 U.S. 667, 670 (1986), superceded on other grounds by 42 U.S.C. § 405; see also Coalition for Sustainable Res, Inc. v. United States Forest Serv., 259 F.3d 1244, 1251 (10th Cir. 2001) (agency inaction is final when the agency refuses to take requested action).

Nothing in the NWRSIA persuades us that Congress sought to preclude judicial review of agency action made pursuant to its provisions. We have seen that the FWS has the authority under the NWRSIA to make decisions binding on the State regarding wildlife management within the NWRS. But that authority is not unlimited as the district court seemed to suggest. See Wyoming, 61 F. Supp. 2d at 1218-23 & n.13. Congress undoubtedly did not intend its call for "effective coordination, interaction,

41

and cooperation with owners of land adjoining refuges and the fish and wildlife agenc[ies] of the State," 16 U.S.C. § 668dd(a)(4)(e), a theme running throughout the NWRSIA, to constitute merely a recommendation which the FWS might ignore with impunity.

Similarly, we reject any suggestion that Congress "committed to agency discretion by law" the FWS's decision to deny the State of Wyoming's request. Even before enactment of the NWRSAA in 1966 and consolidation of the wildlife refuges under one Act, the USDI recognized that the manner in which the Secretary managed fish and wildlife within the NWRS was to be "reasonable and appropriate, as well as related to the purpose for which the refuge area was acquired or established." Authority of the Secretary of the Interior to Manage and Control Resident Species of Wildlife Which Inhabit Federally Owned Real Property Within the National Wildlife Refuge System, 71 Interior Dec. 469, 475 (1964). In its opinion, the USDI further acknowledged that "[r]egardless of the particular species of wildlife for which the refuge area was primarily acquired, the Secretary must use sound conservation principles which are designed to . . . protect the general ecology, in administering all refuge areas." Id.

We believe the provisions of the NWRSIA do nothing to alter these constraints on the Secretary's, and thus the FWS's, exercise of discretion. Simply put, "[t]here is law to apply" in this case. Sabin v. Butz, 515 F.2d 1061, 1065 (10th Cir. 1975) (rejecting the Government's argument that the Forest Service's denial of a special use permit to

42

allow downhill skiing on forest land was committed to agency discretion by law). Congress throughout the NWRSIA has indicated an intent to circumscribe the FWS's discretion. The requirement that the FWS in developing a conservation plan for each refuge comply with State policies and objectives to the "extent" or "maximum extent practicable," id. §§ 668dd(e), undoubtedly places limits on the agency's discretion. See Random House Dictionary 1517 (2d ed. 1987) (defining "practicable" as "capable of being done, effected, or put into practice, with the available means").

Additionally, in determining whether a proposed "use" of a refuge constitutes a "compatible use," i.e., a use that "will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge," the NWRSIA directs the Secretary to exercise "sound professional judgment." 16 U.S.C. § 668ee(1). The NWRSIA defines the phrase "sound professional judgment" as "a finding, determination, or decision that is consistent with principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of this Act and other applicable laws." Id. § 668ee(3). The legislative history of § 668ee reveals that Congress expected "the FWS to be energetic and creative in seeking such resources, including partnerships with the States, local communities and private and nonprofit groups." H.R. Rep. No. 105-106, at 6. Thus, Congress rejected the idea that the FWS's exercise of "sound professional judgment" under the NWRSIA is unreviewable.

43

The Committee is aware of concerns that the definition of sound professional judgment confers such a level of discretion that compatibility determinations might be held to be unreviewable as an agency action "committed to discretion by law" within the meaning of the . . . APA . . . . [The NWRSIA] provides detailed standards and procedures to be followed in making compatibility determinations and, thus, while discretion resides in refuge officials, there is clearly law to apply so as to permit judicial review . . . .

Id. at 7; see Coggins & Ward, supra, at 72 ("[T]he trend in wildlife legislation, especially federal legislation, is clearly in the direction of more standards and less discretion.").

Clearly then, nothing in the NWRSIA or its legislative history indicates that Congress sought to preclude judicial review of the FWS's decision in this case. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410 (1971), abrogated in part by Califano, 430 U.S. at 105. Likewise, the FWS's decision does not fall within the judicial review exception for action "committed to agency discretion by law." 16 U.S.C. § 701(a). Accordingly, we conclude that § 701(a) of the APA does not preclude judicial review of the FWS's decision to deny the State of Wyoming's request to vaccinate elk on the NER with Strain 19.

Of course, our review of the FWS's decision at this point is limited given the procedural posture of this case. The district court ostensibly dismissed Count III pursuant to Fed. R. Civ. P. 12(b)(6) (although its reasoning might have supported Count III's dismissal under Rule 12(b)(1) as well). Having established the district court's jurisdiction over Count III, we now look to the well-pleaded facts of the State's first amended complaint to determine whether Count III's substantive claim should

44

proceed beyond the pleading stage.  See E.W.F., 264 F.3d at 1303, 1305.

2.

As in Counts I and II, the State of Wyoming's request for relief in Count III of the first amended complaint is sweeping and overbroad.  In Count III, the State "is seeking only a judicial interpretation as a matter of law as to whether the [NWRSIA] . . . preempts Wyoming's sovereign authority to manage resident wildlife within the Refuge System."  We provided that interpretation in resolving Count I, and need not repeat ourselves.  Nevertheless, construing Count III "as to do substantial justice," Fed. R. Civ. P. 8(f), we believe the FWS's decision may be subject to a "thorough, probing, in-depth review" under the traditional agency review principles set forth in § 706(2)(A) of the APA.  Overton Park, 401 U.S. at 415 (explaining that the presumption of regularity in the Secretary's informal decision did not shield that decision from a "substantial" judicial inquiry).  Our decision to construe Count III of the first amended complaint in this manner, despite the State's inartful pleading, rests upon the following factors–

> (1) the long-standing and increasingly urgent nature of the brucellosis problem in elk on the NER and its threat to Wyoming's domestic cattle and resident elk populations;
>
> (2) the FWS's inability after more than a decade to reach any real consensus regarding the efficacy and biosafety of the Strain 19 vaccine as applied to elk on the NER;
>
> (3) the "Catch-22" in which the State of Wyoming finds itself in struggling with the apparently discordant views over brucellosis control and eradication between the USDA and the FWS;

45

(4) the Congress' ongoing reluctance to address the brucellosis problem in wildlife; and

(5) the State of Wyoming's and FWS's bipolar claims of absolute power to decide the fate of elk on the NER.

The State of Wyoming recognizes its responsibility to protect both domestic livestock and wildlife within its borders. This responsibility includes disease control, prevention, and eradication. According to the State's first amended complaint, the FWS's refusal to allow the State to vaccinate free-ranging elk on the NER with Strain 19 has significantly (1) reduced the efficacy of the State's own Strain 19 vaccination program in its domestic cattle and resident elk populations, and (2) increased costs to the State and its producers because of the continuing threat to the State's USDA brucellosis-free certification.

The State alleges that extending its vaccination program to the NER will not adversely affect the refuge because Strain 19 is a safe and effective means of containing brucellosis, and thus "[n]either the ecosystem nor the elk herds will be negatively impacted." The State further alleges that the FWS's program to control brucellosis on the NER has proven ineffective.[21]

> [The FWS] has continued with an ineffective disease program which has remained unchanged even though this [district] [c]ourt previously found

---

[21] The FWS apparently has a four part plan to combat brucellosis on the NER: (1) increase and disperse available forage; (2) locate additional forage; (3) increase elk hunting to reduce elk populations; and (4) when proven safe and effective, implement a vaccination program. See Aplt's App. at 420.

46

[the FWS's] actions to be negligent.[22]  The disease control methods used by [the FWS] today are the same methods used for the previous twenty years.  [The Secretary] sets policy, supervises and directs the actions of the [FWS] in total disregard of the rights of Wyoming to control diseases and protect wildlife, livestock and its citizens in a health and safety matter.

Finally, the State alleges that the FWS has failed to conduct any independent studies on

---

[22]  In Parker Land and Cattle Co., 796 F. Supp. at 477, a Wyoming ranching concern failed to establish that wildlife from federal lands caused a 1988 brucellosis outbreak in its cattle.  In reaching its decision, however, the district court found that "over the years the [S]tate [of Wyoming] has attempted to reduce the risk of transmission of brucellosis by vaccinating elk on its feed grounds, but the NER has had no vaccination program of its own and in fact has opposed it, without particularly good reason for that position." Id. at 483-84.  "The only active brucellosis precaution which the NER has undertaken is changing its feeding methods from hay to alfalfa pellets in order to reduce the amount of time the elk spend on the feedline." Id. at 485.  The court continued:

    144.  A representative of the FWS told . . . the WGFD that the FWS would not make a "big push" to eradicate this disease in wildlife unless they were held liable in a lawsuit. . . .

    145.  The federal government agencies involved in this case have known of the brucellosis problem in wildlife for many years but have done very little more than form several committees to study the disease.

    146.  It was unreasonable for these agencies to do nothing more than commission studies in light of the fact it was their actions in managing the wildlife which dramatically increased the transmission of the disease.  The least they could have done was to cooperate whole heartedly with the state in its vaccination program.

    147.  Thus the FWS and the NPS [National Park Service] have acted negligently in managing the wildlife, in that they each have failed to take an active role in eliminating the brucellosis problem in the elk and bison which are under their control.

Id. at 486.  According to the State's complaint, nothing has changed over the last decade.

the efficacy and biosafety of Strain 19. Rather, according to the State, the FWS bases its criticism of Strain 19 solely on statistical analysis of limited depth and scope.

Accepting the foregoing allegation as true, we have little difficulty concluding that the State of Wyoming states a claim for relief in Count III of its first amendment complaint. If, as the State suggests, the Strain 19 vaccine is a safe and effective means of containing brucellosis in free-ranging elk, and the FWS has no viable alternative means of reducing the high rate of brucellosis-infected elk on the NER, then the FWS decision to deny the State's request to vaccinate elk on the NER with Strain 19 may very well be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Thus, we conclude that the district court erred in dismissing Count III for failure to state a claim upon which relief may be granted.

IV.

As we recently recognized, "[h]abitat management is a delicate venture." Sierra Club-Black Hills Group v. United States Forest Serv., 259 F.3d 1281, 1286 (10th Cir. 2001). To make matters worse, jurisdictional allocation regarding wildlife management within the NWRS is a legal quagmire. Unfortunately, the NWRSIA with its broad language and general directives is not particularly helpful in resolving any particular conflict, especially where resolution of that conflict, whether agreed upon or court ordered, will inevitably affect the interests of dual sovereigns. To that extent, wildlife management is inherently political. See Coggins & Ward, supra, at 70, 84.

Thus, wildlife managers simply cannot view wildlife management in isolation, as the FWS appears to be doing in this instance. See id. at 70. The FWS's apparent indifference to the State of Wyoming's problem and the State's insistence of a "sovereign right" to manage wildlife on the NER do little to promote "cooperative federalism." Given the NWRSIA's repeated calls for a "cooperative federalism," we find inexcusable the parties' unwillingness in this case to even attempt to amicably resolve the brucellosis controversy or find any common ground on which to commence fruitful negotiations.[23]

To be sure, deference to agency action is appropriate "where that action implicates scientific and technical judgments within the scope of agency expertise." Sierra Club-Black Hills Group, 259 F.3d at 1286. The problem is that after an extended period of time, the FWS still appears unable or unwilling to make any judgment regarding the biosafety and efficacy of Strain 19 as applied to free-ranging elk. But the law requires answers. For instance, the FWS has never explained why the State's proposal would "stand as an obstacle to the accomplishment and execution" of federal objectives. American Honda, 529 U.S. at 883. Due to health and safety concerns, the FWS

---

[23] Notably, the FWS, WGFD, and other concerned agencies have adopted a management plan for the brucellosis-infected, free-ranging bison herd that winters on the NER. See Aplt's App. at 194. See also Fund for Animals, Inc. v. Lujan, 962 F.2d 1391 (9th Cir. 1992) (upholding a joint plan by the USDI, USDA, and State of Montana to kill brucellosis-infected bison leaving Yellowstone National Park as a means of protecting the State's cattle industry from the disease).

effectively pulled the plug on the State's vaccination of elk on the NER after a trial run from 1989-1991. That was over a decade ago and the FWS has yet to resolve these concerns.

Tellingly, at no time in this litigation has the FWS sought to rely on its temporary "[e]mergency power" as provided for in 16 U.S.C. § 668dd(k), to justify its position in this matter.[24] Given that the FWS effectively suspended the State's Strain 19 vaccination program on the NER over a decade ago due to health and safety concerns, the "temporary" nature of FWS's action has long since passed. Instead, in typical bureaucratic fashion, the FWS now claims that it needs an (1) elaborate efficacy study of Strain 19, (2) an environmental impact study, and (3) a comprehensive review of the State's proposed course of action as it affects the FWS's trust responsibilities to elk and other wildlife residing on the refuge. See Aplt's App. at 35-36. This proves too much too late in the day. If the executive and legislative branches of our Government will not act to resolve the brucellosis controversy in the State of Wyoming in what little time remains, the judicial branch may have to.

The State's apparent end purpose in pursuing this suit is to protect itself, its producer's domestic livestock, and its free-ranging elk from a threat arising out of the

---

[24] Section 668dd(k) provides: "Notwithstanding any other provision in this Act, the Secretary may temporarily suspend, allow, or initiate any activity in a refuge in the System if the Secretary determines it is necessary to protect the health and safety of the public or any fish or wildlife population." (emphasis added).

50

FWS's alleged lack of any meaningful program to combat brucellosis on the NER. Simplicity ends when we are faced with a situation where the program, or lack thereof, by one sovereign allegedly impairs the meaningful accomplishment of another sovereign's responsibilities. Unlike the district court, we do not read the NWRSIA as providing the FWS, through the Secretary of the USDI, with unlimited discretion to act or fail to act in a manner that threatens the well-being of a neighboring sovereign's livestock or game industry.

We affirm the district court's dismissal of Counts I and II of the State's first amended complaint under Fed. R. Civ. P. 12(b)(1). We reverse the district court's dismissal of Count III of the State's first amended complaint under Fed. R. Civ. P. 12(b)(6), and remand this matter to the district court for "full plenary review" of the FWS's decision consistent with Part III.C. of this opinion. See Overton Park, 401 U.S. at 420. On remand, the district court in its discretion may require the State to amend Count III of its first amended complaint. The district court also should oversee creation of the appropriate administrative record. See Camp v. Pitts, 411 U.S. 138 (1973) (discussing the proper procedure when a court determines that an agency's stated justification for informal action does not provide an adequate basis for review). We leave to the district court's discretion whether creation of that record requires a remand to the FWS. See Overton Park, 401 U.S. at 416-21. We also leave to the district court to determine in the first instance the appropriate level of deference,

51

if any, to be given the FWS's position in this case. See United States v. Mead Corp., 533 U.S. 218 (2001).


AFFIRMED IN PART, REVERSED IN PART, and REMANDED.